## LYONS v. WOODS.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF NEW MEXICO.

No. 267. Submitted March 13, 1894. — Decided May 14, 1894.

*Field* v. *Clark*, 143 U. S. 649, would seem to be decisive of this case.

The council of the legislature of the Territory of New Mexico which took part in the passage of the act approved March 14, 1884, authorizing the building of a penitentiary, and of the act approved March 29, 1884, to provide for the building of a capitol, having been recognized by the governor of the Territory, and by the secretary of the Territory, and by the House of Representatives of the Territory, and it further appearing that the objections to its organization now made were brought to the attention of Congress, and that that body took no action on the subject, and the courts of the Territory having adjudged that those statutes were duly enacted; *Held*, That considerations of public policy forbid this mode of attacking the validity of officers *de facto*, whatever defects there may have been in the legality of their appointment or election.

The allegations of this bill make no such case for interposition as would justify the courts in going behind the enrolled bills, as deposited with the secretary of the Territory, and declaring them invalid because some of the members of the council were seated without certificates of election.

THIS was a bill filed by James Lyons and others in the District Court of the Third Judicial District of the Territory of New Mexico for the county of Grant, August 27, 1885, against Woods and others, being the collector of taxes, the assessor, and the county commissioners for that county, aver-

ring that complainants were taxpayers within said county, whose property was referred to and described in the tax list and assessment roll in the hands of defendant Woods, collector, which list and roll were prepared from assessments made by the assessor of Grant County, compiled under the direction of the board of county commissioners, and approved by that board, and received by Woods, as collector, August 13, 1885, said list and roll being, under the laws of the Territory, the warrant under and by virtue of which the collector was about to collect and was collecting the various sums of money making up the several items of taxation as therein set forth. That among the items of taxation in said tax list and assessment roll for 1885, and upon which each of complainants was therein noted as being taxed, were two items respectively described in said list as penitentiary taxes and capitol building taxes, set down in columns, headed "penitentiary bonds" and "capitol building bonds," and levied as taxes upon complainants, and each of them, for the purposes described by said column heading.

The bill then set forth the several assessments of complainants' property respectively and the amounts severally taxed thereon, and alleged that the items described went to make up the sums total which the collector was about to collect from complainants respectively as the amount of taxes due "from each for various purposes pretended to be warranted by law and pretended to be due and payable for and during the year 1885; that the amounts of money thus in said list pretended to be due and payable upon account of penitentiary bonds and upon account of capitol building bonds and as taxation so levied for and on account of said items are so claimed and levied and included in said list by virtue and under authority of pretended acts of the legislative assembly of said Territory pretended to have been approved by the governor of said Territory, which said pretended acts so pretended to have been approved are entitled and described respectively as follows: 'An act authorizing the building of a penitentiary in the Territory of New Mexico, and regulating its management,' approved March 14, 1884, and 'An act to provide for the erection

of a capitol building in the city of Santa Fé,' approved March 29, 1884."

The bill then continued: "Your orators further represent that said pretended taxes under the pretended acts of the said legislative assembly aforesaid, and by the terms thereof, are to be assessed and levied in the same manner as other territorial taxes are levied and collected. Your orators further represent that the said pretended special taxes provided for under said pretended acts of the legislative assembly have been assessed by the tax assessor of the said county of Grant, passed upon by the board of county commissioners of said county sitting as a board of equalization as required by law, and are now on the tax lists in the hands of said defendant Woods, as collector of the county of Grant, which said tax lists in the hands of said collector have attached to them the warrant provided by law requiring said collector to collect the taxes by said lists or rolls shown to have been levied, and that copies of said lists or rolls are now on file in the probate clerk's office of said county of Grant, and that all the steps required by law for the proper levy of taxes with reference thereto have been taken, so that the said lists and rolls in the hands of said defendant, the collector as aforesaid of said county of Grant, and the copies thereof in the said probate clerk's office on their face and by virtue of said pretended acts of the said legislative assembly aforesaid and the general revenue law of the Territory are a lien upon the real and personal property of your orators in said county of Grant, and are a cloud upon the title of your orators to their property, and that said taxation pretended to have been assessed under invalid and pretended laws of said Territory, as hereinafter alleged, have the force and effect of personal judgment against your orators and are liens upon their property as aforesaid, and said lists or rolls are by law given the effect of executions against the property of your orators so assessed.

"Your orators further represent that said pretended acts of the legislative assembly entitled, as aforesaid, 'An act authorizing the building of a penitentiary in the Territory of New Mexico and regulating its management,' approved

March 14, 1884, and ' An act to provide for the erection of a capitol building in the city of Santa Fé,' approved March 29, 1884, under which said assessment of taxation is made, and by virtue of which said pretended liens against your orators' property are asserted, and by virtue of which said pretended assessment rolls are claimed to have the effect of executions in the hands of the said defendant as sheriff and *ex officio* collector of said county of Grant, are not and never have become valid laws of said Territory of New Mexico, for the reason that the same never were introduced and passed through the council of said legislative assembly when a legal quorum of said council was present and participating in the proceedings thereof, and for the reason that a majority of a legal quorum of said council never voted in favor of said pretended laws so as to legally pass the same through said body ; and your orators charge the facts to be that an act of Congress of the United States of America was passed and approved on the 14th day of February, 1884, and thereby became a law, which said act of Congress, among other things, provided that a session of the legislative assembly of said Territory should be held, and said assembly convene on the third Monday of February, A.D. 1884 ; and said act of Congress declared that the members elected to the territorial legislature of said Territory in November, 1882, and all vacancies legally filled since that time, if any, should be the legal members of the legislature by said act authorized, subject to all valid contest.

" Your orators further state that in accordance with said act of Congress a pretended session of said legislative assembly was held, commencing on the third Monday of February, A.D. 1884.

" Your orators further state the fact to be, and that the same so appears by the published journal of the proceedings of said pretended sessions of the council of said legislative assembly, that upon the convening of said council on the said third Monday in February, A.D. 1884, only five members appeared who had regularly received certificates of election and were so shown to be elected by the election returns of the said election held in November, A.D. 1882, to have been

elected members of said council; to wit, José Armijo y Vigil, of Socorro County; Pablo Gallegos, of Rio Arribi County; W. H. Keller and Andrew Sena, of San Miguel County; and John A. Miller, of Doña Ana, Lincoln, and Grant Counties, and that thereupon the said five persons qualified as members of said council by taking the oath of office required by law and signing the roll of members.

" Your orators further allege that by law the said council is composed of twelve members, and that seven thereof are necessary to constitute a legal quorum for the transaction of business.

" Your orators further allege that after said five members had been sworn in, as aforesaid, a motion was unanimously adopted by the vote of said five members only, and no more, that Thomas B. Catron, of Santa Fé County, be declared entitled *prima facie* to the seat from Sante Fé County, and that thereupon the said Thomas B. Catron took the oath of office as a member of said council, signed its roll, and thereafter acted as a member thereof.

" And your orators further allege that said Catron's seat was claimed by Henry L. Warren, of Santa Fé County, and that said Warren held a certificate of election as a member of said council from Santa Fé County; which said certificate was the first certificate of election issued by the county commissioners as evidence of the election of members of said council from said county at said election held in said month of November, A.D. 1882, but that afterwards said county commissioners, acting under protest and compelled by an order of the District Court in said county of Santa Fé, issued a certificate of election to said Thomas B. Catron.

" Your orators further allege that they are not informed as to whom the election returns on file in the office of the secretary of the Territory show to have been elected as a member of said council from the said county of Santa Fé at said election.

" Your orators further allege that afterwards, while said council was composed of the said five persons as aforesaid and the said Thomas B. Catron and no others, a motion was

therein introduced by the said John A. Miller to the effect that Charles C. McComas and José Manuel Montoya, be declared entitled *prima facie* to the seats from Bernalillo County, subject to the right of contest, and that said motion was unanimously adopted by the vote of the said six members and no more, who were then acting, as aforesaid, as members of said council.

"Your orators further allege that said Charles C. McComas and José Manuel Montoya held no certificates of election whatever as members of said body, but, on the contrary, Charles Montaldo and Francisco Perea held the certificates of election to the seats therein of the members from said county of Bernalillo, and that all the election returns of the election held in said month of November, A.D. 1882, both in the office of the county commissioners, and in that of the secretary of said Territory, showed and still show that said Charles Montaldo and Francisco Perea received a majority of the votes cast in said county at said election for members of the council from said county, and that said Charles C. McComas and José M. Montoya did not receive a majority of said votes so cast and were not duly elected members of said council.

"Your orators further allege that the said Charles C. McComas after the said election in November, A.D. 1882, had commenced proceedings as a contestant for the seat of said Charles Montaldo as a member in said council from Bernalillo County, and served his notice of contest on said Montaldo and taken testimony under said notice of contest, and that said José M. Montoya had so commenced contest proceedings against the said Francisco Perea for the other seat of the member from said county of Bernalillo, and that said notice of contest so served and testimony so taken were duly filed with the secretary of the Territory, and by him were transmitted and delivered to the said pretended council so organized as aforesaid, and at the time of the proceedings aforesaid the said papers relating to said contest were in possession of the said secretary, and that long afterwards, to wit, on the 3d day of April, A.D. 1884, the committee on elections of said pretended council reported to said body that the said contested election

cases had been referred to them, and that they found that said McComas and Montoya were entitled to the seats then held by them in said body, which said reports are stated by the journal published by said body to have been on said day adopted.

"Your orators further allege that the said six persons aforesaid and the said McComas and Montoya constituted said council until on or about the 25th day of March, A.D. 1884, when the said W. H. Kellar absented himself from said body and never afterwards participated in its proceedings.

"And your orators further allege that after the said Kellar had ceased to act with said body J. Innocente Valdez, who was elected a member of the council from Colfax and Mora Counties, took the oath of office and participated in the proceedings; but your orators allege that at no time during the pretended session of said body did more than six persons, including the said Thomas B. Catron, take part in its proceedings, except the said Charles C. McComas and J. M. Montoya, unlawfully and arbitrarily seated as aforesaid.

"And your orators further allege that, including the said McComas, Montoya, and Catron, there were just eight members of said body present and voting when the said bill aforesaid, entitled 'An act authorizing the building of a penitentiary in the Territory of New Mexico and regulating the management,' was introduced and passed through its several readings in said body; that said last-mentioned bill by the journal of said pretended council is alleged to have passed, under a suspension of the rules of said council, on the 14th day of March, A.D. 1884, and which said journal shows that there were present on said day the said José Armijo y Vigil, T. B. Catron, Pablo Gallegos, W. H. Kellar, and McComas, Miller, Montoya, and Sena, and no more, and that said journal does not show that said last-mentioned bill was ever passed on any other day, and that on said day it had never been determined by any legal quorum or by any other way except by the illegal and arbitrary action of the said six persons aforesaid that said McComas and Montoya were entitled to said seats in said body.

"And your orators further allege that, including the said McComas, Montoya, and Catron, there were just eight members of said body present and voting when said bill aforesaid, entitled 'An act to provide for the erection of a capitol building in the city of Santa Fé,' was introduced and passed through its several readings in said body; that said last-mentioned bill, by the journal of said body, is alleged to have passed, under a suspension of the rules, on the 26th day of March, A.D. 1884, and which said journal shows there were present on said day the said José Armijo y Vigil, T. B. Catron, and McComas, Montoya, Gallegos, Sena, Miller, and Valdez, and no more, and that of these Messrs. Catron, McComas, Montoya, Gallegos, Sena, and Armijo y Vigil voted in favor of the passage of said last-mentioned bill, while Messrs. Miller and Valdez voted against the passage of the same; and that said journal does not show that said last-mentioned bill was ever passed on any other day, and that on said day it had never been determined by any legal quorum or by any other way, except by the illegal and arbitrary action of the six persons aforesaid, that said McComas and Montoya were lawfully entitled to seats in said body.

"Your orators further represent that said pretended acts of the legislative assembly aforesaid, having been approved by the governor's signature attached thereto and filed in the office of the secretary of the Territory and certified by said secretary as valid laws, legally passed by the legislative assembly of the Territory, and that said acts have been incorporated and published in volumes of the laws of the Territory, so that on their face they seem to be valid laws, so as to give apparent validity to the assessment of said taxation and to the lien on the property of your orators aforesaid, when in truth and fact the said pretended acts of the said legislative assembly were never legally passed by said legislative assembly and are absolutely null and void, and that by reason of the premises the said defendant, collector as aforesaid, has acquired and can acquire no authority in law whatever for exacting and collecting the said pretended taxes from your orators, either by virtue of said pretended acts of the legislative assembly or the steps taken as aforesaid thereunder."

The bill then set up various grounds of equity interposition, not necessary to be repeated, and prayed an injunction and for general relief. To this bill a general demurrer was filed by the defendants and sustained, and the complainants declining to plead further, the bill was dismissed for want of equity with costs, December 4, 1885, whereupon complainants prayed an appeal to the Supreme Court of the Territory, by which the decree was affirmed on the authority of *Chavez* v. *Luna,* 21 Pac. Rep. 344, Brinker, J., dissenting, Id. 345. The case was thereupon brought by appeal to this court.

*Mr. W. B. Childers* for appellants.

The court will look at the journals of legislative bodies to see if legislation has been constitutionally and legally enacted: *South Ottawa* v. *Perkins,* 94 U. S. 260; *Gardiner* v. *Collector,* 6 Wall. 499; *Brown* v. *Nash,* 1 Wyoming, 85; *Post* v. *Supervisors,* 105 U. S. 667; *Gregg* v. *Forsythe,* 24 How. 179; *The Railroad Tax Case,* 8 Sawyer, 238; *Green* v. *Weller,* 32 Mississippi, (3 George,) 650; *Spangler* v. *Jacoby,* 14 Illinois, 297; *S. C.* 58 Am. Dec. 571; *Barnes* v. *Starne,* 35 Illinois, 121; *Ryan* v. *Lynch,* 68 Illinois, 160; *Pacific Railroad* v. *Governor,* 23 Missouri, 353; *S. C.* 66 Am. Dec. 673; *Burnham* v. *Morissey,* 14 Gray, 226; *S. C.* 74 Am. Dec. 676; *Southwark Bank* v. *Commonwealth,* 2 Penn. St. 446; *DeBow* v. *People,* 1 Denio, 9.

As to what constitutes a quorum, and what is meant by "House" in the organic act, see *Southworth* v. *Palmyra & Jackson Railroad,* 2 Michigan, 287; *In re The Executive Session,* 12 Florida, 653.

There can be no such thing as *de facto* legislation. The rule that the acts of *de facto* officers are upheld applies to purely ministerial officers.

Constitutional restrictions upon legislative bodies would be entirely nugatory if any rule can be applied to sustain acts of a body of usurpers claiming to be a legislature.

No appearance for appellees.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

By § 3 of the organic act of the Territory of New Mexico, act of September 9, 1850, c. 49, 9 Stat. 446, the executive power and authority in and over that Territory was vested in a governor, whose dúty was, among others, to "approve the laws passed by the legislative assembly before they shall take effect." By the fourth section it was provided that there should be a secretary of the Territory, who shall "hold his office for four years unless sooner removed by the President of the United States," and that "he shall record and preserve all the laws and proceedings of the legislative assembly hereinafter constituted, and all the acts and proceedings of the governor in his executive department; he shall transmit one copy of the laws and one copy of the executive proceedings, on or before the first day of December in each year, to the President of the United States, and, at the same time, two copies of the laws to the Speaker of the House of Representatives and the President of the Senate, for the use of Congress." By § 5 "the legislative power and authority of said Territory shall be vested in a governor and a legislative assembly. The legislative assembly shall consist of a council and house of representatives. The council shall consist of thirteen members, having the qualification of voters hereinafter prescribed, whose term of service shall continue two years. The house of representatives shall consist of twenty-six members, possessing the same qualifications as prescribed for members of the council, and whose term of service shall continue one year." By § 7 it was enacted "that the legislative power of the Territory shall extend to all rightful subjects of legislation consistent with the Constitution of the United States and the provisions of this act. . . . All the laws passed by the legislative assembly and governor shall be submitted to the Congress of the United States, and, if disapproved, shall be null and of no effect."

By chapter 1 of title XXIII of the Revised Statutes, provisions were made "common to all the Territories;" and most of those in the organic act of New Mexico were there reproduced, with the addition of certain matters of detail.

By § 1842, it was provided in nearly the identical words, *mutatis mutandis*, of paragraph two of section seven of article

I of the Constitution of the United States, that every bill which had passed the legislative assembly of any Territory should, before it became a law, be presented to the governor; if he approved it, he should sign it, but if not, he should return it, with his objections, to the house in which it originated, and that house should enter the same on its journals and proceed to reconsider it. If, after such reconsideration, two-thirds agreed to pass it, it should be sent, together with the objections, to the other house, where it should likewise be reconsidered, and, if approved by two-thirds of that house, should become a law. "But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the persons voting for or against the bill shall be entered on the journal of each house." The section then provided for a bill becoming a law in like manner, as if signed by the governor, if not returned by him within three days, Sundays excluded, (or five days in Washington and Wyoming,) after it had been presented, unless the legislative assembly, by adjourning *sine die*, should prevent its return, in which case it should not become a law.

By § 1844 it was provided that the secretary of such Territory should record and preserve all the laws of the legislative assembly and all the acts and proceedings of the governor in the executive department, "and transmit one copy of the laws and journals of the legislative assembly, within thirty days after the end of each session thereof, to the President," as well as two copies of the laws to the President of the Senate and the Speaker of the House for the use of Congress. And it was further provided that "he shall prepare the acts passed by the legislative assembly for publication, and furnish a copy hereof to the public printer of the Territory, within ten days after the passage of each act."

By the act of July 27, 1868, c. 272, 15 Stat. 239, 240, the organic act was amended, and that amendment was carried forward into § 1921 of the Revised Statutes, which reads: "The secretary of the Territory of New Mexico, upon the convening of the legislature thereof, shall administer the oath of office to the members elect of the two houses and the

officers thereof, when chosen; and no other person shall be competent to administer such oath save in the absence of the secretary; in which case, any one member of either house may administer the oath to the presiding officer elected, and he shall administer the same to the members and other officers."

The acts of the legislative assembly of the Territory of New Mexico at its twenty-sixth session, which convened at the capitol at the city of Sante Fé on Monday, the 18th day of February, 1884, and adjourned on Thursday, the 3d day of April, 1884, were duly certified to by the secretary of the Territory as having been compared with the enrolled originals and original translations thereof, respectively, on file in his office, and that the same were true and correct copies thereof, and published by authority.

Among these acts, as so published, appear " An act authorizing the building of a penitentiary in the Territory of New Mexico and regulating its management," approved March 14, 1884; and an act entitled "An act to amend an act authorizing the building of a penitentiary and regulating its management, approved March 14, 1884," approved March 26, 1884; and " An act to provide for the erection of a capitol building in the city of Sante Fé," approved March 29, 1884. Laws of New Mexico, c. 58, 59, 60.

The legislative journals for that year, to which reference will hereafter be made, show that each of these acts was signed by the president of the council and the speaker of the house, and its approval by the governor reported to the house in which the act originated in each instance.

The question in this case is whether the territorial courts should have gone behind the enrolled bills whose passage was thus duly attested, and which were duly approved, placed in the proper depository, and duly certified to and published, and held them void upon the ground that certain members of the quorum of one of the two bodies by which they were passed were seated without having certificates of election. And this notwithstanding the fact that " all the laws passed by the general assembly and governor " were, as must be assumed, duly submitted to Congress, and that body did not see fit to

disapprove any of them under the power reserved by section
seven of the organic act, a power which had been exercised
affirmatively in some instances.    Act of April 10, 1869, c. 21,
16 Stat. 44; act of July 14, 1870, c. 270, 16 Stat. 278; act of
February 3, 1879, c. 41, 20 Stat. 280.

In *Miners' Bank* v. *Iowa,* 12 How. 1, 7, a question arose
whether the validity of a certain act of the Territory of Iowa
could be brought before this court under the 25th section of
the judiciary act, and it was held it could not, the court
saying: "It seems to us, that the control of these territorial
governments properly appertains to that branch of the govern-
ment which creates and can change or modify them to meet
its views of public policy, viz., the Congress of the United
States.   That control certainly has not been vested in this
court, either in mode or in substance, by the 25th section of
the judiciary act.   It has been argued in this case, that as
Congress, in creating the territorial governments of Wisconsin
and Iowa, reserved to themselves the power of disapproving
and thereby annulling the acts of those governments, and had,
in the exercise of that power, stricken out several of the
provisions of the charter of the Bank of Dubuque, enacted by
the legislature of Wisconsin, assenting to the residue; that
therefore the charter of this bank should be regarded as an
act of Congress, rather than of the territorial government;
and consequently the decision of the state court, in favor of
the repealing law of Iowa, must be held to be one in which
was drawn in question and overruled the validity of a statute
of or an authority exercised under the United States, and as a
decision also against a right, title, or privilege set up under a
statute of the United States.   The fallacy of this argument is `
easily detected.   Congress, in creating the territorial govern-
ments, and in conferring upon them powers of general legisla-
tion, did not, from obvious principles of policy and necessity,
ordain a suspension of all acts proceeding from those powers,
until expressly sanctioned by themselves, whilst for considera-
tions equally strong they reserved the power of disapproving
or annulling such acts of territorial legislation as might be
deemed detrimental."

In *Chavez* v. *Luna*, 21 Pac. Rep. 344, the Supreme Court of New Mexico held, upon a bill of complaint setting up in substance the same matters as alleged here, that where the constitution of a State prescribed the mode to be observed by the legislature in passing bills, there was no doubt whatever about the power of a court to inquire into the question as to whether the constitution had been violated or not, but that that rule of law did not apply to the state of facts presented in that case, in which the only question was one of the organization of the body ; and *People* v. *Mahaney*, 13 Michigan, 481, was cited to the point that courts cannot entertain a bill to review the action of a legislature in the manner of its organization, or the election or qualification of its members. Referring to section seven of the organic act of the Territory, the court declined to decide whether, in the general terms therein used, conferring legislative power upon the legislative assembly of New Mexico, it was intended to confer the usual and ordinarily incidental power to determine finally the election, qualification, and return of the members, but concluded that as by that section all laws passed by the legislative assembly and governor had to be submitted to Congress, and, if disapproved, were null and void and of no effect, it must be presumed that these acts were so submitted, and, there being nothing to show that they were disapproved, that they had received the passive assent of the Congress, and had been in that way approved, and that, therefore, there was nothing upon which to ground the jurisdiction of the court over the subject sought to be reviewed. In the present case the decree below was affirmed on the authority of *Chavez* v. *Luna*, and the dissent was placed upon the ground that mere non-action by Congress was not to be taken as an approval of the acts of the legislature so as to preclude judicial investigation.

We need not consider this difference of opinion further than to say that the fact that resort to Congress was open to those who objected to the legality of the acts passed by this legislative assembly is not without significance in inquiring into the jurisdiction of the courts in the premises.

In *Field* v. *Clark*, 143 U. S. 649, it was held by this court,

upon great consideration, that the signing by the Speaker of the House of Representatives and by the President of the Senate in open session of an enrolled bill is an official attestation of such bill as one that has passed Congress; and that when the bill thus attested receives the approval of the President and is deposited in the Department of State according to law, its authentication as a bill that has passed Congress is complete and unimpeachable. That conclusion was reached in view of the clauses of the Constitution of the United States bearing upon the subject, and would seem to be decisive of this case.

It is true that the courts of many of the States under constitutional or statutory provisions of a peculiar character, which, expressly or by necessary implication, required or authorized the court to go behind the enrolled act, when the question was whether the act, when authenticated and deposited in the proper office, was duly passed by the legislature, have announced a different conclusion. These cases are given in the notes to *Field* v. *Clark*, and some of them are referred to and considered in the opinion in that case. But as the organic act of New Mexico, taken with the Revised Statutes, conforms quite closely to the provisions of the Federal Constitution, the rule laid down in *Field* v. *Clark* governs the case before us.

Perhaps, however, it would be proper to extend our examination somewhat further. The question whether a seeming act of a legislature has become a law in accordance with the fundamental law is a judicial one to be tested by the courts and judges, and not a question of fact to be tried by a jury. *South Ottawa* v. *Perkins*, 94 U. S. 260, 267; *Post* v. *Supervisors*, 105 U. S. 667. In the first case *Gardner* v. *The Collector*, 6 Wall. 499, 511, was cited with approval, in which the court laid down the proposition: "That whenever a question arises in a court of law of the existence of a statute, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which' in its nature is capable of conveying to the judicial mind a clear

and satisfactory answer to such question; always seeking
first for that which in its nature is most appropriate, unless
the positive law has enacted a different rule." And see *In re
Duncan*, 139 U..S. 449; *Jones* v. *United States*, 137 U. S. 202,
216; *Field* v. *Clark*, *supra*.

The bill alleged that the council consisted of twelve mem-
bers, seven constituting a quorum. By the organic act it was
provided that the council shall consist of thirteen members,
Act of September 9, 1850, c. 49, § 5; 9 Stat. 446, 448. The
act of June 19, 1878, c. 329, 20 Stat. 193, limited the num-
ber to twelve and directed the legislative assembly to divide
the Territory into representative and council districts. An
act of June 27, 1879, c. 40, 21 Stat. 35, referred to the act of
June 19, 1878, and to " the twelve members of the council."
In the sessions of 1880 and 1882 there appear to have been
thirteen members of the council, Acts New Mexico, 1880, 11;
Acts 1882, 7. By an act of December 21, 1881, the election
held for members of the legislature on the second day of
November, 1880, was declared to be valid, and all the acts
of the legislature, the members of which were chosen at that
election, were validated, and the legislature directed to appor-
tion the representative and council districts, but it was pro-
vided that if they failed to do so the apportionment should
be made in accordance with an act referring to the legisla-
tures of Montana, Idaho, and Wyoming, approved June 3,
1880, c. 119, 21 Stat. 154, Act of December 21, 1881, c. 3, 22
Stat. 1. By an act of February 14, 1884, c. 6, it was provided
" that the members elected to the territorial legislature of
New Mexico in November, anno Domini eighteen hundred
and eighty-two, and all vacancies legally filled since that time,
if any, are hereby declared to be the legal members of the
legislature hereby authorized, subject to all valid contests."
And the legislature was directed to convene on the third
Monday of February, 1884. 23 Stat. 3. But whether com-
posed of twelve or thirteen members, there can be no doubt
that seven constituted a quorum authorized to do business.

It was the duty of the secretary of the Territory, under
section 1921, to administer the oath of office to the members

elect of the two houses, and there is nothing in this bill to exclude the presumption that he did so, and if so, it is difficult to see why persons so sworn in did not thereby become entitled in the first instance to take their seats, or why the council thus organized was not at least a council *de facto.*

The charges of the bill relate to three out of eight members, but as to one of these, Mr. Catron, the bill states that while he did not originally have a certificate of election from the board of county commissioners, which was *ex officio* the canvassing board, he did have a certificate issued by that board, under the order of the district court, in respect of which adjudication no further question appears to have been made. Neither as to him nor the two other members, (Mr. McComas and Mr. Montoya,) whose title to their seats is questioned, was it alleged that they were not elected to the council, but the averment as to the latter is that the election returns of the election held in November, 1882, showed and still show that two other persons received a majority of the votes cast in Bernalillo County at the election of members of the council for that county, and that the two sitting members did not receive a majority of the votes so cast and were not duly elected members of said council.

Reference is made in the bill to the journals of the council and house of the legislative assembly of New Mexico for its twenty-sixth session, and we have examined them as published by authority. That of the council, after stating that the legislative council assembled February 18, 1884, in conformity with the act of Congress, (23 Stat. 3,) recites that the secretary of the Territory being present, "proceeded to call the names of the councilmen elected from the different counties, respectively, for the purpose of swearing them in as such. The following gentlemen answered and were duly sworn, and signed the official register, to wit." Then follow the names of eight persons, including those whose title to seats is questioned in this proceeding. The record shows that the election of officers thereupon ensued, who being duly sworn in by the secretary, that officer retired. A committee was then appointed to wait upon the governor and inform him that the

council was duly organized and ready to receive any communication which he might be pleased to make them, which committee having retired in the discharge of the duty assigned them, after a short absence returned, and reported that they had done so and that the governor " recognized this body as legally organized, and would be ready to deliver his message to both houses in joint session on the next day." But this record of the proceedings of February 18, 1884, is preceded by a prefatory statement headed " organization." This states that the secretary of the Territory appeared at the council chamber at noon " for the purpose of swearing in the members of the council, (all as a question of fact being present ;) he was met with a degree of confusion, which, being long continued," the secretary retired and proceeded to the house, where organization was effected. Subsequently, and on the same day, the secretary of the Territory called the members of the council to order and made some remarks, stating among other things, " the seats of members from Bernalillo County are disputed. It appears from the judgment of the district court presented, it has passed upon the question involved in the case of county officers elected at the same election that the members of the legislature were, from that county ; and decided adversely to those elected upon the face of the returns, and that a large number of fraudulent votes were cast. And it appearing that the application of the same facts would change the result as to members claiming to have been elected upon the same ticket, and it likewise appearing that the question of fraud in said election has become one of public notoriety, and it also appearing that the seat of the member from Santa Fé County is involved in a similar contest, it therefore seems to me proper and just that at this time, the members only who are not involved in the contest should be sworn." Whereupon five members signed the oath and were sworn in. The secretary thereupon further remarked : " In view of the situation it seems to me just, in the absence of law to the contrary, that the members sworn in and not involved in contest should express their judgment as to who of the contestants are *prima facie* entitled to be sworn in. For this purpose, and this pur-

pose alone, I will consider a motion to be submitted without debate." A motion was then made that Thomas B. Catron be declared entitled *prima facie* to the seat from Santa Fé County, subject to the right of contest, which motion was carried by unanimous vote. The name of Mr. Catron was then called by the secretary, and he appeared, signed the oath, and was sworn in. A similar motion was made as to Messrs. McComas and Montoya, which being adopted by unanimous vote, their names were called by the secretary and they appeared, signed the oath, and were sworn in as members from Bernalillo. Mr. José Armijo y Vigil was then elected president of the council and sworn in by the secretary, and "the latter then retired." We understand the object of this preface to be to explain that the three persons, in respect of whom it was claimed that they were improperly admitted to seats to the council, did not take their seats in virtue of the vote of the five members, whose right to act as members of the council was not disputed, but that the vote of those five was simply taken by the secretary as advisory, he himself determining upon his own responsibility who were entitled to be sworn in. So far as the record proper is concerned, irrespective of this prefatory matter, nothing appears upon the journals to show that this was otherwise.

The journal of the house discloses similar proceedings as to certain members from Bernalillo County. It further appears therefrom that two bodies had organized, each claiming to be the territorial council, one presided over by J. F. Chavez and the other by J. Armijo y Vigil, and each had sent a communication to that effect to the house. The house thereupon appointed a committee to ascertain which of the two councils was legally organized, a majority of which reported that, according to the law of the United States, the secretary of the Territory was "the only authorized person to administer the oath to the members of either body of the legislature; that no body can legally be organized until first being sworn in by said officer;" "that the body represented and presided over by Hon. José Armijo y Vigil have been duly sworn in by the secretary of the Territory and recognized by the gov-

ernor of the Territory, as the regularly organized and legal legislative council;" and recommended that the house recognize such council accordingly. The majority report was adopted, the sitting members from Bernalillo County voting in the affirmative, but there being a majority without them.

On the other hand, among the joint resolutions passed and approved at the session of the legislative assembly in question and to be found in the laws for 1884 as published, is one approved April 3, 1884, reciting that whereas the chairman of the Committee on Territories of the United States Senate had advised the governor of the purpose of the committee "to investigate the questions at issue in connection with the memorial of J. Francisco Chavez and others, referred to said committee," and having requested certain record evidence bearing upon the issues aforesaid, it was resolved that the secretary be authorized and directed to turn over for the use of that committee "all poll books of the said precincts of the counties of Bernalillo and Santa Fé, of the election held on the 7th day of November, 1882, and all other record evidence concerning and touching said election in said counties now in his possession." Laws New Mexico, 1884, 241. The memorial thus referred to will be found in the Congressional Record for the first session of the Forty-eighth Congress, p. 1549, where it appears that a memorial signed by Mr. Chavez and six others, holding, as they state, the proper legal evidences of election to the twenty-sixth legislative assembly of New Mexico, was presented to the Senate of the United States on March 3, 1884, and was referred to the Committee on Territories.

This memorial refers to the provisions of the territorial laws that "each branch of the legislative assembly shall decide and determine the election and qualifications of their own members under the rules and restrictions that may be respectively adopted by each branch for that purpose." That "if a contested election be pending, the person holding the certificate of election shall take possession and discharge the duties of the office until the contest shall be decided." Comp. Laws New Mexico, 1865, c. 63, §§ 35, 50. And that the board of county commissioners shall act as boards of canvassers of

the elections within their respective counties; "and shall immediately issue a certificate of election, under their hands, to the person that may have received the highest number of votes for any office." Laws New Mexico 1876, c. 1, § 14, par. 9.

The proceedings of February 18, 1884, are then related at length, and it is insisted that the conduct of the secretary was unlawful, arbitrary, and in defiance of right, justice, and the plain provisions of the law. We are not advised as to what became of the investigation based on the memorial and referred to in the joint resolution, but it would appear that Congress took no action whatever in the premises, although its attention was thus called to the condition of affairs.

It is undisputed, therefore, that the council which participated in the enactment of these laws was recognized by the governor and the secretary of the Territory and by the house, nor is there any suggestion in the bill of the existence of any other council than the one thus recognized; and the courts of the Territory have adjudged that these acts were duly enacted.

In the meantime, it must be presumed that bonds have been issued to provide funds for the erection of a penitentiary and a capitol, and that these public works have gone forward. Considerations of public policy and necessity for the protection of the public and individuals whose interests may be affected thereby forbid this mode of attacking the validity of acts of officers *de facto*, if this council were no more than that, whatever defects there may be in the legality of their appointment or election. *Norton v. Shelby County,* 118 U. S. 441.

Under these circumstances we think it clear that the judgment of the Supreme Court of the Territory must be affirmed.

In *Clough* v. *Curtis,* 134 U. S. 361, 371, petitions for mandamus to compel the secretary of the Territory of Idaho to record certain proceedings as part of the proceedings of a session of the legislature of the Territory, and to compel the clerk of the territorial house to bring his minutes and journals into court to be there corrected, came under review, and this court said : " It is not one of the functions of

a court to make up the records of the proceedings of legislative bodies. Nor can it be required, in a case not involving the private interests of parties, to determine whether particular bodies assuming to exercise legislative functions, constitute a lawful legislative assembly. Such a question might indeed arise in a suit depending upon an enactment passed by such an assembly. And it might be that, in a case of that character, and under some circumstances, the court would be compelled to decide whether such an enactment was passed by a legislature having legal authority to enact laws. How far in the decision of such a question the judiciary would be concluded by the record of the proceedings of those bodies, deposited by the person whose duty it was to keep it, with the officer designated by law as its custodian, are questions we have no occasion at this time to consider."

Without undertaking to consider under what circumstances which of two legislative bodies may be judicially determined to be the lawful and true body, or when or how the lawful organization of a legislative body may be judicially drawn in question, we are of opinion that the allegations of this bill made no such case for interposition as would have justified the courts in going behind the enrolled bills as deposited with the secretary of the Territory, and declaring them invalid because some of the members of the council were seated without certificates of election.

We may add that, by an act passed by the legislative assembly in question, approved April 3, 1884, (Laws New Mexico, 1884, c. 66,) a compilation of the laws of the Territory was provided for, which compilation was duly made and published by authority, (Compiled Laws New Mexico, 1884;) that an official index to these compiled laws was adopted; the compiled laws amended in many particulars; and other acts of 1884 amended or repealed, by the succeeding, the 27th legislative assembly, (Laws New Mexico, 1886, 1887, c. 49, and *passim ;*) and an act was also passed for the issue of bonds "for the purpose of paying the present and current indebtedness of the capitol building," (Laws 1886–7, c. 45,) which latter act was approved by Congress on June 23, 1888, c. 693, 25 Stat. 340.　　　　　　　　　　　　　　*Decree affirmed.*