**GRIFFIN v. SHELDON (UNITED STATES SMELTING, REFINING & MINING CO. et al., Intervenors).**

No. A–4597.

District Court of Alaska.

Third Division.   Anchorage.

June 28, 1948.

⬤⟶55

McCutcheon & Nesbett, of Anchorage, Alaska, for plaintiff.

Ralph J. Rivers, Atty. Gen., of Alaska, for defendants.

J. Gerald Williams, of Anchorage, Alaska, H. L. Faulkner, of Juneau, Alaska, and Edward F. Medley, of Seattle, Wash., for intervenors.

DIMOND, District Judge.

In this action the plaintiff challenges the validity of an Act of the Alaska Territorial Legislature passed at the 1947 session of that body and appearing in official print as Chapter 74 of the Session Laws of Alaska 1947, the title of which is: "An Act To amend Chapter 4 of the Extraordinary Session laws of Alaska, 1937, as amended by Chapters 1 and 51, Session Laws of Alaska, 1939, as amended by Section 20, Chapter 40, Session Laws, 1941, by amending Subsection 7(c) providing for and establishing an Experience Rating for Territorial Employers under the Alaska Unemployment Compensation Law and amending Subsection 4(d) and to declare an effective date."

The defendant, R. E. Sheldon, is the executive director of the Unemployment Compensation Commission of Alaska and the defendants, Ernest F. Jessen, Anthony Zorich and George Vaara, are members of the Commission. The several intervenors are corporations having an interest in the outcome of this litigation since they will be financially affected by the decision given herein.

The plaintiff brings this suit as a resident and taxpayer of Alaska. His averments to that effect in his complaint are admitted by the defendants' answer. The intervenors, but not the defendants, dispute the right of the plaintiff as a citizen and taxpayer to bring and maintain this action. While the issue was not raised by demurrer, the jurisdiction of the Court is questioned and, therefore, notice must be taken of it.

■ The action involves the validity of an amendment of one important feature of the Unemployment Compensation Act of Alaska. This Act bears such an intimate relation to the economic well-being of the Territory that the fate of that portion of the Act which is here involved may well affect every citizen and taxpayer in the Territory. The decision here given may conceivably sway the establishment of enterprise or the undertaking of employment in Alaska. Accordingly, the plaintiff as a citizen and taxpayer was eligible to bring, and is eligible to maintain, this action.

The Unemployment Compensation Act of Alaska was originally enacted at an extraordinary session of the Alaska Territorial Legislature held in 1937, and is Chapter 4 of the Session Laws of that session. At subsequent sessions of the Legislature the law has been extensively amended, the latest enactment being that of 1947 which is here in issue. The original law, with the several amendments, covers all of the various features of unemployment compensation legislation and was enacted pursuant to federal legislation on the subject. Every aspect of unemployment compensation is evidently taken care of in the Act.

It is asserted in the plaintiff's amended complaint that the principal beneficiaries of the questioned legislation are "nonresident, seasonal employers, engaged in the fish and mining industries and not accountable for, nor concerned with, the economy of the Territory of Alaska." Par. VII.

All such considerations are totally irrelevant. We are here concerned with the legal status of what appears to be a legislative act, and not with the wisdom or expediency of its enactment. Moreover, constitutions and statutes and the elementary principles of justice unite in the mandate that no discrimination be shown between residents and non-residents, between "Saints and Strangers."

Four grounds of invalidity of the Act of 1947 are urged:

(1) That the enacting clause of the law is inadequate because it does not conform with the requirements of Section 8 of the Act of August 24, 1912, 37 Stat. 514, 48 U.S.C.A. § 76, which provides: "No law [enacted by the Alaska Territorial Legislature] shall embrace more than one subject, which shall be expressed in its title." The Act of August 24, 1912, is commonly known as the Organic Act of Alaska and will be hereinafter referred to as the Organic Act.

(2) That the bill was not lawfully passed by the House because a motion to reconsider duly and regularly made was declared out of order and not voted upon by the House, in violation of the rules of the House.

(3) That the bill was vetoed by the Governor and was not thereafter considered or voted upon by either House of the Legislature.

(4) That the bill in passage by the House did not have "three separate readings" as required by Section 13 of the Organic Act, 48 U.S.C.A. § 85.

In order to understand several of the points involved it is necessary to give a history of the legislation.

The bill, known as Senate Bill No. 105, was introduced in the Senate and was considered by that body and passed in due course. It then came into the House on the 47th day of the session and was read the first time and referred to appropriate committees, House Journal page 648. In this connection it is to be noted that under the Organic Act, 48 U.S.C.A. § 74, sessions of the Legislature are limited to 60 days. On the 50th day of the session the committee reported the bill back to the House recommending enactment, House Journal, page 683. Not until the 55th day of the session was the bill brought up in the House for consideration and read the second time, House Journal, page 843, whereupon numerous amendments to the bill were offered and voted upon, House Journal, pages 843 to 848. At the conclusion of all the amendments we find the following: "It was moved by Mrs. Engstrom, seconded by Mr. D. Anderson, that the Rules be suspended as to Senate Bill No. 105, that it be considered re-engrossed, advanced to third reading, read by number only and placed in final passage." House Journal, pages 848 and 849. Vote was thereupon taken and the rules were suspended and the bill passed by a vote of 16 yeas to 8 nays. The Journal recites that "Senate Bill No. 105 was read the third time *by number only*," page 849. (Emphasis supplied.) Later in the same day we find in the Journal, page 858, that one of the members, Mr. Barnett, who had voted in favor of the bill, "gave notice of his intent to move for a reconsideration of his vote" thereon. Thereupon it was moved by another member that the rules be suspended and that the bill be reconsidered immediately, but this motion failed of passage by a vote of 13 yeas to 10 nays, a two-thirds vote being required to pass. And so the vote on the bill was not then reconsidered, House Journal page 858.

On the following day, the 57th of the session, we find a Journal entry, page 872, indicating that a message from the Senate was read transmitting the enrolled copy of Senate Bill No. 105 for the signatures of the Speaker and the Chief Clerk of the House and that the Speaker announced he had signed the enrolled copy of Senate Bill No. 105 and ordered the same returned to the Senate. Later in the same day, Mr. Barnett, who had theretofore given notice of his intent to ask for re-

consideration of the bill, moved that it be reconsidered at that time. The Speaker ruled the motion out of order. An appeal was taken from the ruling of the chair. That ruling was put to the House and the decision of the Chair was sustained by a vote of 14 yeas to 8 nays, House Journal page 881.

On that same day, the 57th of the session, and probably before the motion to reconsider was brought up in the House, the Senate had ordered the bill to be transmitted to the Governor, Senate Journal page 678. Apparently it was so transmitted because on the 59th day of the session, in the afternoon, a message from the Governor to the President of the Senate was read to the Senate, Senate Journal pages 715 et seq. Singularly enough, the Governor's message, except for a letter from the Attorney General therein quoted, is not printed in the Senate Journal, but it appears in the House Journal, page 998. Evidently the Governor returned the bill to the Senate because of the failure of the House to dispose of the motion for reconsideration before the bill was sent to the Governor, as appears by letter from Attorney General Rivers to the Governor, Senate Journal page 715, House Journal page 998. The Senate voted to return the bill to the Governor immediately, Senate Journal page 717, and it seems clear that action was taken accordingly.

The House Journal of March 27, 1947, the 60th and last day of the session, shows the reading of a message from the Governor, House Journal page 997, which is dated that day, wherein the Governor, in part, states: "I have transmitted Senate Bill No. 105 to the Office of the Secretary of Alaska for permanent filing. Senate Bill No. 105 becomes law without my signature. * * *"

The foregoing recital embraces mention of the several days of the session at which the bill in the various stages was considered by the House and the Senate because of the provisions, hereinafter quoted, of Section 14 of the Organic Act, 48 U.S.C.A. § 86, with respect to the Governor's veto power.

## Is the Subject of the Act Expressed in the Title?

The mandate of our Organic Act that the subject of each legislative act must be expressed in the title may not be ignored as inconsequential or irrelevant, Territory of Alaska v. Alaska Juneau Gold Mining Company, 9 Alaska 360; Id., 9 Cir., 105 F.2d 841, 9 Alaska 557, but the word "subject" should receive a construction that appears reasonable to literate men and women, Wickersham v. Smith, 7 Alaska 522, 543, from which the following is quoted: "It is universally held that the title of an act which is attacked for a violation of this constitutional provision shall be construed liberally, for the purpose of upholding the law, if practicable, so as not to embarrass the Legislature by a construction unnecessary to the accomplishment of the beneficial purposes for which it was enacted."

As was observed by the United States Circuit Court of Appeals for the Fifth Circuit in the case of Hidalgo & Cameron Counties Water Control v. American Rio Grande Land & Irrigation Company, 5 Cir., 103 F.2d 509, 512: "The purpose of the constitutional provision is to prevent combining several unrelated subjects into one bill to get support for it which the several subjects might not separately command; and to prevent surreptitious introduction of legislation not indicated by the title."

The Circuit Court of Appeals for the Ninth Circuit in the case of In re Boswell, 9 Cir., 96 F.2d 239, has arrived at substantially the same conclusion, and in the case of Utah Power and Light Company v. Pfost, 286 U.S. 165, 187, 52 S.Ct. 548, 554, 76 L.Ed. 1038, we find the following: "Section 16, art. 3, of the Idaho Constitution provides:—'Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title.' * * * The purpose of the constitutional provision, as this court said in Posados v. Warner, Barnes & Co., 279 U.S. 340, 344, 49 S.Ct. 333, 334, 73 L.Ed. 729, 'is to prevent the inclusion of incongruous and unrelated matters in the

same measure and to guard against inadvertence, stealth and fraud in legislation. * * * the courts disregard mere verbal inaccuracies, resolve doubts in favor of validity, and hold that, in order to warrant the setting aside of enactments for failure to comply with the rule, the violation must be substantial and plain.'"

■ Applying the law as stated above, the "subject" of the legislation here in question is adequately expressed in the title of the Act.

■ The other three grounds of the alleged invalidity of the Act, namely, (a) failure to dispose of motion to reconsider in the House, in contravention of the Rules of the House; (b) veto of the bill by the Governor; and (c) failure to read the bill three times as required by the Organic Act, could each and all be disposed of speedily, and in favor of the validity of the Act, had the Governor actually signed the bill in approval thereof. Such a decision would be arrived at, and, indeed, compelled, by the controlling authority of the Supreme Court of the United States expressed in the case of Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294, wherein it was held that an enrolled bill signed by the Speaker of the House, and the President of the Senate, and bearing the approving signature of the President of the United States, and deposited with the Secretary of State according to law, was final and conclusive evidence of its status as a law, and was "unimpeachable," 143 U.S. at page 672, 12 S.Ct. at page 497, 36 L.Ed. 294, and in the case of Lyons v. Woods, 153 U.S. 649, 663, 14 S.Ct. 959, 38 L.Ed. 854, which applied the law so laid down in Field v. Clark to an act of a Territory of the United States. See also, Carlton v. Grimes, 1946, 237 Iowa 912, 23 N.W.2d 883, 892. The division of judicial opinion on the subject is outlined in Volume 1 of Sutherland on Statutory Construction, 3d Ed., pages 223 to 236, and in Ritzman v. Campbell, 1915, 93 Ohio St. 246, 112 N.E. 591, 593, L.R.A.1916E, 1251, Ann.Cas.1918D, 248. However, it appears that in the Supreme Court the doctrine of Field v. Clark has not been departed from.

■ But in this case the enrolled bill upon its face shows that it was not signed by the Governor, nor is there anything in the enrollment to show that it became law without the Governor's approving signature. Introduced in evidence among the exhibits of the case is a certified copy of what purports to be a carbon copy of a letter dated March 27, 1947, written by the Governor to the President of the Senate, containing the declaration that "Senate Bill No. 105 becomes law without my signature," the same letter, or message, which is found in the House Journal at page 997. There is nothing in that certified copy nor in the certificate thereof to show conclusively that the Governor ever wrote or signed such a letter or that the declarations therein set out are controlling with respect to the bill mentioned. Only by reference to the Journals of the House and the Senate can adequate assurance be found that the bill may have become law without the Governor's signature. Since it is necessary to refer to the Journals in an attempt to establish the validity of the Act, it obviously becomes the duty of the Court to give full examination to all of the Journal entries, to determine whether the bill was lawfully enacted. If reference must be made to the Journals at all, then that reference should be complete and comprehensive for all proper purposes, and the conclusive and "unimpeachable" presumption that the questioned legislative act is valid law, arising from the production of the enrolled bill signed by the Speaker of the House and the President of the Senate and by the Governor in approval thereof, is completely overthrown.

Instead of saying at this point, as might have been said if the Governor had signed the bill, that none of the objections to the Act, other than that involving the title, can be entertained because they are conclusively denied by the enrolled bill itself, it is thus necessary to consider and decide the three additional grounds upon which the plaintiff says the law is void.

### Refusal of Vote on Reconsideration

Rule 48 of the House Rules concerning reconsideration of bills is shown in the House Journal, pages 1030, 1031, as follows:

"No motion, bill, resolution or memorial shall be reconsidered on the day on which

the final vote was taken, but it shall be in order, on that day, for a member, who voted on the prevailing side, to give, and have entered in the Journal, a notice of intention to move a reconsideration.

"When such notice is given any member may, on the next working day, move a reconsideration of the question. The motion for reconsideration opens for debate the question to be reconsidered and shall have precedence over every other motion except a motion to adjourn.

"No notice or reconsideration shall be in order, on the day preceding the last day of the session.

"There shall be but one reconsideration, even though the action of the House after reconsideration is opposite the action of the House before reconsideration.

"If a member gives notice that he intends to move a reconsideration, the Clerk shall not report the measure to the Senate until the reconsideration is disposed of, or the time for moving the same has expired."

It is clear that the House itself ignored the provisions of Rule 48 with respect to the enactment of Senate Bill No. 105. A member gave due notice of his intention to move for reconsideration according to Rule. On the following day as required by the Rule he brought up the motion, but the Speaker held that the motion was out of order, apparently on the theory that the bill had already been returned to the Senate. In fact, it seems virtually certain that the Senate had already forwarded it to the Governor. Whereupon another member of the House appealed from the ruling of the Chair and upon that appeal the Chair was sustained. The action so taken brought into play the provisions of Rule 83, House Journal, page 1041, which reads as follows: "The rules of parliamentary practice comprised in Roberts' Rules of Order shall govern in all cases in which they are not inconsistent with the standing rules and orders of the House."

Consulting Roberts' Rules of Order, as we are required to do by Rule 83 above quoted, at pages 81 and 82, we find the following: "If the decision from which an appeal is taken is of such a nature that the reversal of the ruling would not in any way affect the consideration of, or action on, the main question, then the main question does not adhere to the appeal, and its consideration is resumed as soon as the appeal is laid on the table, postponed, etc. But if the ruling affects the consideration of, or action on, the main question, then the main question adheres to the appeal, and when the latter is laid on the table, or postponed, the main question goes with it. Thus, if the appeal is from the decision that a proposed amendment is out of order and the appeal is laid on the table, it would be absurd to come to final action on the main question and then afterwards reverse the decision of the chair and take up the amendment when there was no question to amend. The vote on an appeal may be reconsidered."

Applying these provisions of Roberts' Rules of Order, we find that the House, in effect, by sustaining the decision of the Chair, did vote on the motion to reconsider.

■ The reluctance of courts to pronounce legislative acts void solely because of violation of legislative rules of procedure, as distinguished from controlling constitutional or statutory provisions, is noted and supporting cases cited in Volume 1 of Sutherland on Statutory Construction, pages 122 to 124, Section 601; also in Carlton v. Grimes, supra.

Rule XVIII of the Rules of the National House of Representatives provides that: "When a motion has been made and carried or lost, it shall be in order for any member of the majority, on the same or succeeding day, to move for reconsideration thereof * * *" House Rules and Manual 77th Congress, page 374.

The notes following the printing of the rule in the House Rules and Manual show the following, based largely, if not entirely, upon Hinds' and Cannon's Precedents of the House of Representatives, pages 376, 377:

"A motion to reconsider may be entertained, although the bill or resolution to which it applies may have gone to the

other House or the President, (V, 5666-5668)."

\*   \*   \*   \*   \*   \*

"A bill is not considered passed or an amendment agreed to if a motion to reconsider is pending, the effect of the motion being to suspend the original proposition (V, 5704); and the Speaker declines to sign an enrolled bill until a pending motion to reconsider has been disposed of (V, 5705). But when the Congress expires leaving unacted on a motion to reconsider the vote whereby a simple resolution of the House has been agreed to, it is probable that the resolution would be operative; and where a bill has been enrolled, signed by the Speaker, and approved by the President, it is undoubtedly a law, although a motion to reconsider may not have been disposed of (V, 5704, footnote).

Reference to the footnote mentioned indicates that the last clause of the above quoted text is based in part upon opinions of two Speakers of the House given after adjournment and therefore not official, and in part on the opinion of the Court in Field v. Clark, supra.

In Congress the practice is to make and dispose of motion to reconsider immediately upon passage of the bill. For example, as soon as a bill is passed, one who voted in favor of passage moves to reconsider the bill, and immediately another member, also favorable to passage, moves to lay the motion to reconsider on the table. In the House the matter may be disposed of by a statement of the Speaker as follows: "The bill is passed and without objection a motion to reconsider is laid on the table."

■ It follows that, under the circumstances, in the case of Senate Bill No. 105, the failure of the House to directly vote on the motion to reconsider is not fatal to the validity of the Act.

Was the Bill Vetoed by the Governor?

■ With respect to veto of bills passed by the Alaska Territorial Legislature, the Organic Act, Section 14, 48 U.S.C.A. § 86, provides as follows: "Except as herein provided, all bills passed by the legislature shall, in order to be valid, be signed by the governor. Every bill which shall have passed the legislature shall be certified by the presiding officers and clerks of both houses, and shall thereupon be presented to the governor. If he approves it, he shall sign it and it shall become a law at the expiration of ninety days thereafter, unless sooner given effect by a two-thirds vote of said legislature. If the governor does not approve such bill, he may return it, with his objections, to the legislature. He may veto any specific item or items in any bill which appropriates money for specific purposes, but shall veto other bills, if at all, only as a whole. Upon the receipt of a veto message from the governor each house of the legislature shall enter the same at large upon its journal and proceed to reconsider such bill, or part of a bill, and again vote upon it by ayes and noes, which shall be entered upon its journal. If, after such reconsideration, such bill or part of a bill shall be approved by a two-thirds vote of all the members to which each house is entitled, it shall thereby become a law. If the governor neither signs nor vetoes a bill within three days (Sundays excepted) after it is delivered to him, it shall become a law without his signature, unless the legislature adjourns sine die prior to the expiration of such three days. If any bill shall not be returned by the governor within three days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the legislature, by its adjournment, prevents the return of the bill, in which case it shall not be a law."

The language above quoted is entirely orthodox. Similar provisions, with variations in particulars, may be found in the Constitutions of the several States and in the Constitution of the United States. While argument has been made in favor of the asserted veto of the bill, supported by authority, State v. Sessions, 1911, 84 Kan. 856, 115 P. 641, 645, Ann.Cas. 1912A, 796, it is completely overcome by the declarations of the Governor himself above quoted and appearing at page 997 of the House Journal. In such case where the actions of the Governor are susceptible of two different constructions, his own statements on the subject must control.

Accordingly, the conclusion is that the bill was not vetoed by the Governor.

### Three Separate Readings

The Organic Act, Section 13, provides that a bill in order to become a law shall have three separate readings in each House. The House Rules, Rule 65, provides that: "The first reading shall be by title only, unless otherwise ordered by the House, * * *."

With respect to the second reading of the bill, Rule 68 shows the following: "When the bill comes up for its second reading the Clerk shall read the bill and the report of the committee in full, section by section, and it shall then be before the House for debate and amendment."

Rule 70, below quoted, gives directions as to the third reading of the bill: "On its third reading the bill shall be read in full, section by section. The only question on the third reading of a bill shall be upon its passage and no amendment shall be entertained—but the House may at any time before the final passage of the bill, by a majority vote of all the members to which it is entitled, recommit the bill with instructions to amend."

The House Journal, page 648, recites that Senate Bill No. 105 was read the first time and referred to the Committee on Judiciary and Federal Relations with a further reference to the Committee on Labor, Capital and Immigration. The second reading of the bill is shown at page 843 of the House Journal in the following language: "Senate Bill No. 105 was read the second time."

The pages of the Journal following page 843 show that several amendments were offered to the bill and that those amendments were voted upon and defeated. Common knowledge of legislative practice raises the inference that the amendments were debated. Counsel for the intervenors argue that the entire bill must have been read during this debate, but nothing in the Journal so indicates.

Now, we are brought forward to the third reading and final passage of the bill. We find from the Journal, pages 848 and 849, that a member of the Legislature moved for suspension of the rules that the bill "be considered re-engrossed, advanced to third reading, read by number only and placed in final passage." A vote was taken upon the proposal to suspend the rules which was carried by two-thirds majority, whereupon we find in the Journal, page 849, the following: "Motion carried and Senate Bill No. 105 was read the third time *by number only.*" (Emphasis supplied.)

As indicated above, Rule 70 of the House Rules requires that on its third reading the bill shall be read in full, section by section. Assuming without deciding that the failure to read a bill section by section on its third reading is not fatal to its validity, we are obliged to ask whether the reading of a bill by number only is such a reading as is contemplated by Section 13 of the Organic Act. On that point no controlling decision has been found. In fact, no adjudicated case has been discovered involving the validity of the statute where one of the readings of the bill prescribed by the Constitution was by number only. It seems reasonable to assume that in passing the Organic Act and providing therein for three separate readings of bills in the Alaska Territorial Legislature, Congress had in view its own procedure, and that procedure is that the first and third readings of the bill are invariably by title only, and in the second reading alone is the bill read at length and section by section. In fact, in the House of Representatives a practice of "Scientific Reading", as it is called, is sometimes permitted whereby, if there is no objection, a bill of considerable length is read in a startlingly brief period of time.

The decisions on the subject are not uniform. In the case of Weill v. Kenfield, 54 Cal. 111, the Court held that reading a bill meant reading all of it. But elsewhere we find the opposite doctrine announced, in harmony with the practice of the national Congress: People ex rel. Hart v. McElroy, 1888, 72 Mich. 446, 40 N.W. 750, 2 L.R.A. 609; Central of Georgia Railway Co. v. State of Georgia, 1898, 104 Ga. 831, 31 S.E. 531, 42 L.R.A. 518; Kentucky-Tennessee Light & Power Co. v. City of Paris, 9 Cir., 1931, 48 F.2d 795. Moreover, common knowledge indicates that in the Alaska Legislature the third reading

474

of a bill until the 1947 session almost invariably had been by title only. To require more without some specific controlling law or rule on the subject would be to ignore the uniform practice and to measurably abandon the authority of common sense. But what may be said of a reading of a bill by number only? In the instant case, Senate Bill No. 105, the bill had evidently been under discussion for a considerable period of time before the motion was made to suspend the rules to pass the bill. Although the bill was read the third time by number only, it seems almost certain that every member who voted on the passage of the bill knew precisely what he was voting upon. But instances may be conceived of in which a bill comes before one of the Houses of the Legislature not so debated and discussed, when to read the bill by number only would give its members no idea of the contents. In this connection we may again properly consider the provisions of the Organic Act that the subject of the bill shall be expressed in the title. Therefore, in the Alaska Legislature to read the title of a bill is indisputably to inform every member the subject of the measure which is thus brought up for vote. Neither the research of counsel nor that of the Court has been able to disclose a single case wherein the bill challenged was read by number only.

In argument it was urged upon the Court that to hold void the Act under consideration, would establish a precedent that might invalidate many other acts passed at the same session of the Legislature. A reference to the House Journal discloses that other bills were read the third time by number only. Usually it was done by unanimous consent, but that was not the case with respect to Senate Bill No. 105. The unanimous consent would, of course, completely negative any objection to the validity of the law on the ground that it had not been read properly the required number of times as provided by the Rules of the House. Former Vice President Garner has been quoted as having said that

the Senate could do anything—legislatively, of course—by unanimous consent except amend the Constitution of the United States. In any event, the effect of the decision in this case on other acts of the Legislature ought not be a controlling influence in its making. Moreover, it may be finally shown that all such other acts as to which the third reading was by number only are so signed, approved and enrolled as to be "unimpeachable" under the authority of Field v. Clark, supra.

The Organic Act of Alaska is in a sense the Constitution of the Territory. Its commands must be adhered to with reasonable fidelity by the Legislature as to enactment of legislation as well as in other respects. Making every allowance that ought to be made in favor of liberality of construction, no convincing reason has been offered, or even attempted, to justify the reading of a bill by number only as one of the three readings required by Section 13 of the Organic Act. Counsel for the intervenors vigorously assert that during debates in the proposal of amendments the bill must have been read several times, but that is only their conclusion. There is nothing in the Journal to show the reading of anything except the amendments, though it does seem probable that in comparing the amendments with the text of the bill as reported by the committee, the members must have been familiar with every provision of the bill. But that is not sufficient, since in this case reference must be made to the Journal and the Journal affirmatively shows that there was no third reading of the bill as required by Section 13 of the Organic Act. Failure to read the bill the third time as required by the Organic Act is fatal to its validity. For that reason only, the Act of the Alaska Territorial Legislature of the 1947 session which in the passing was known as Senate Bill No. 105 and which appears as Chapter 74 of the Session Laws of Alaska 1947, is now held to be void and of no effect. Findings and decree may be prepared accordingly.