Gretchen Bailey SUBER, a Taxpayer of the State of Alaska, on Behalf of herself and others similarly situated, Appellant,

v.

ALASKA STATE BOND COMMITTEE, Honorable William A. Egan, Governor of Alaska, Commissioner of Commerce, Honorable E. N. Courtney, Floyd L. Guertin, Commissioner of Administration, Honorable R. D. Stevenson, Commissioner of Revenue, Alaska Department of Commerce, State Bond Committee, Alaska Mortgage Adjustment Agency and the State of Alaska, Appellees.

No. 651.

Supreme Court of Alaska.

May 19, 1966.

548

---

John E. Havelock, of Guess, Rudd & Havelock, Anchorage, for appellant.

Warren C. Colver, Atty. Gen., Juneau, John K. Brubaker, Dist. Atty., Anchorage, Eric E. Wohlforth and Richard L. Sigal, of Hawkins, Delafield & Wood, New York City, for appellees.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

DIMOND, Justice.

On March 27, 1964 an earthquake and seismic waves caused extensive property loss and damage to the southcentral portion of the state.[1]

On August 19, 1964 Congress amended the Alaska Omnibus Act[2] by Public Law 88–451 (78 Stat. 505) to provide assistance to the state for the reconstruction of the

---

1. A Reconstruction and Development Survey of Earthquake Damages in Alaska, prepared for the Federal Construction and Development Planning Commission for Alaska by the Alaskan Reconstruction Consultant Committee, showed property losses and damage in excess of $205 million dollars.

2. Act of June 25, 1959, 73 Stat. 141, entitled "An Act to Amend Certain laws of the United States in light of the admission of the State of Alaska into the Union, and for other purposes."

damaged areas. Section 57 of Public Law 88–451 provides as follows:

Sec. 57. For the purpose of enabling the State of Alaska to retire or adjust outstanding home mortgage obligations or other real property liens secured by one to four family homes which were severely damaged or destroyed in the March 1964 earthquake and subsequent seismic waves, the President is authorized to make additional grants to the State of Alaska in an amount not to exceed a total of $5,500,000 to match, on a fifty-fifty basis, any funds provided by the State to pay the costs of retiring or adjusting such mortgage obligations. In order to be approved, a State application for a grant for carrying out the purpose of this section must: (1) be in accordance with a plan submitted by the State, to be approved by the President, for the implementation of the purpose of this section; (2) designate the State agency for retiring or adjusting said mortgage obligations; (3) provide that the mortgagor shall be required to absorb the damage loss to the entire extent of his equity interest in the property and also agree to pay at least $1,000 of the outstanding mortgage balance; (4) provide that no payments for retiring or adjusting mortgage obligations on a single property shall exceed $30,000; (5) provide regulations to assure equitable treatment among home owners and to prevent unjustified payments or gains to the State, mortgagees or mortgagors; and (6) provide that the State agency will make such reports, in such form and containing such information as the President may from time to time require, and give the President, upon demand, access to the records on which such reports are based.

On September 7, 1964 a special session of the state legislature enacted legislation to implement Section 57 of the Alaska Omnibus Act. Chapters 1, 2 and 3 of that special session are involved in this case.

Section 1 of chapter 1 provides that

It is the intention of the legislature that the State of Alaska cooperate with the federal government in establishing a program to retire or adjust outstanding home mortgage obligations or other real property liens secured by one to four family dwellings which were destroyed or severely damaged in the earthquake of March 27, 1964 and subsequent seismic waves and to comply with the requirements of Section 57 of the "1964 Amendments to the Alaska Omnibus Act."

Section 2 contains an extensive declaration of the purpose of the statute. Section 3 authorizes the State Commissioner of Commerce to make grants to mortgagors for the purpose of retiring or adjusting mortgage obligations or other real property liens secured by one to four family dwellings that were destroyed or damaged in the earthquake and seismic waves of March 27, 1964, and directs the Commissioner of Commerce to prepare a plan to be submitted by the Governor to the President of the United States for the implementation of the purpose of Section 57 of the Alaska Omnibus Act.

Section 4 of chapter 1 provides that grants to mortgagors shall be approved only if the physical damage to the dwellings securing the home mortgage obligation or other real property lien amounts to 60% or more of the pre-earthquake value of the secured property. This section also provides that no grant on a single property shall exceed $30,000, and that the mortgagor shall be required to absorb the physical damage loss to the entire extent of his equity interest in the property and also shall be required to agree to pay up to $1,000 of the outstanding mortgage balance.

Chapter 2 of the 1964 special session provides for the expenditure of $5,500,000 to match grants of federal funds under Section 57 of the Alaska Omnibus Act, with such moneys to be obtained either from the proceeds of the sale of general ob-

ligation bonds under S.L.A.1964, ch. 48 [3] or from funds borrowed from the United States Government by the state as authorized by S.L.A.1964, ch. 104.[4]

Chapter 3 of the special session appropriates to the State Department of Commerce from the federal program receipts to be received by the state pursuant to section 57 of the Alaska Omnibus Act the sum of $5,500,000 for the purpose of adjusting or retiring the home mortgage obligations or other real property liens referred to in chapter 1.

Following the enactment of the foregoing statutes, and pursuant to section 3 of chapter 1, the Governor submitted to the President of the United States an Alaska Mortgage Adjustment Plan for the implementation of the purpose of section 57 of the Alaska Omnibus Act. This plan was approved on behalf of the President by the Housing and Home Finance Administrator on February 18, 1965. The purpose of the plan was to establish administrative guidelines for the program of grants for the retirement or adjustment of outstanding home mortgage obligations or other real property liens secured by one to four family homes destroyed or severely damaged by the March 27, 1964 earthquake and seismic waves.

For purposes of convenience, chapters 1, 2 and 3 of the 1964 special session of the Alaska legislature, and the Alaska Mortgage Adjustment Plan, will be referred to as the Alaska Mortgage Adjustment Program, or more simply, as the Program. Appellant, a taxpayer, brought this action for a declaratory judgment that the Program is unconstitutional and void, and to enjoin the appellees from carrying it out. The trial court entered judgment upholding the constitutionality of the Program. On this appeal appellant attacks the constitutionality and validity of the Program on various grounds, each of which will be considered separately.

*Natural Disaster.*

The Alaska Constitution, Article IX, Section 8 provides:

No state debt shall be contracted unless authorized by law for capital improvements and ratified by a majority of the qualified voters of the State who vote on the question. The State may, as provided by law and without ratification, contract debt for the purpose of repelling invasion, suppressing insurrection, defending the State in war, meeting natural disasters, or redeeming indebtedness outstanding at the time this constitution becomes effective.

It was stipulated that the consummation of the Program necessitated the creation of a state debt without ratification by the voters. Appellant contends that such ratification was required in order to validate the Program because it does not meet a natural disaster as provided in the constitution. It is appellant's position that the contracting of a state debt would be for the purpose of meeting a natural disaster in the constitutional sense only if it entailed necessary and immediate expenditures for emergency measures such as temporary shelter, medical services, soup kitchens, transportation for evacuees, bulldozing rubble, the tearing down of damaged buildings, and the like. Appellant urges that the justification for waiving the requirement of voter ratification would be the absence of an opportunity to hold an election because of the immediate need to provide emergency measures in the wake of a natural disaster, and that where there is involved as there is here an economic measure such as mortgage retirement or readjustment which does not involve immediate action, voter ratification of the state incurred debt was

---

3. S.L.A.1964, ch. 48, as amended, S.L.A. 1964, ch. 107 provided for the issuance of general obligation bonds of the state to meet the effects of the March 27, 1964 earthquake.

4. S.L.A.1964, ch. 104 authorized the state to borrow money from the United States to meet the effects of the March 27, 1964 earthquake.

required because there was opportunity to hold an election.

■ The concept of "meeting natural disasters", within the meaning of the constitution, is one that is not capable of precise definition or description. Whether or not a particular debt contracted for by the state meets a natural disaster must be decided as each case arises and in the light of the particular facts and circumstances of each case.[5] In this area legislative judgment and discretion are involved. As in the case of the appropriation or expenditure of funds for what the legislature deems a public purpose, we will not set aside the determination by the legislature that the contracting of a debt meets a natural disaster unless it clearly appears that such determination is arbitrary and without any reasonable basis in fact.[6]

■ A legislative program that involves contracting a state debt meets a natural disaster when it reasonably tends to cope with the effects of the disaster. That is what happened here. The destruction caused by the earthquake and seismic waves was a natural disaster. One of the direct effects of the disaster was the crushing financial burden placed on homeowners who lost their homes that were burdened by substantial mortgages. They were obliged to pay the mortgage debt, and at the same time were obliged to purchase or rent other homes to live in. The Program reasonably tended to cope with this effect of the disaster by making it possible for home owners to be relieved of the mortgage debt and resulting economic hardship in respect to homes that were damaged extensively and were no longer habitable.

■ The legislature recognized need for relief of this type when it stated in the declaration of purpose in chapter 1 of the 1964 special session that

[T]here is a definite need for relief in the state for mortgagors who have lost their homes but still are burdened by substantial mortgages * * *.

This declaration by the legislature cannot be regarded as mere subterfuge or without adequate basis in fact. To give relief to those who have suffered economic hardship as the result of a natural disaster is to meet such disaster within the meaning of the constitution.

*Public Purpose.*

Under the Program public moneys were used to adjust or retire mortgage obligations or other real property liens secured by one to four family dwellings which were damaged by the earthquake or seismic waves to the extent of 60% or more of their pre-earthquake value. Following the earthquake, and at the time the Program was under consideration, it was estimated roughly that the number of qualifying dwellings represented about $11 million dollars in mortgage obligations. However, after the Program became operative, and at the time of the trial in the court below, it became apparent that the number of dwellings qualifying for relief under the Program represented only about $1.5 million dollars in mortgage obligations out of total mortgage investments in Alaska of over $100 million dollars.

Appellant contends that since the benefits of the Program extend only to a relatively small and restricted class of mortgagors and mortgagees, private purpose alone will be satisfied and no public purpose will be achieved, and therefore public funds are being expended for non-public purposes in violation of the Alaska Constitution, Article IX, Section 6 which provides:

No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose.

■ The basic objective of government is to protect and promote the health, safety and general welfare of the people. When a condition of affairs appears in the state

5. Cf. DeArmond v. Alaska State Dev. Corp., 376 P.2d 717, 721 (Alaska 1962).

6. Ibid.

which presents a threat to the accomplishment of that objective, the government has the right, and the obligation, to cope with such threat by whatever measures, within constitutional limits, that are necessary or appropriate.[7]

The destruction caused by the earthquake and seismic waves threatened to impair the general welfare of a segment of the people of this state. One whose mortgaged home was severely damaged or destroyed was faced with an economic catastrophe. His home was unlivable, he had no insurance to compensate for the loss, he still owed the mortgage debt, and he was obliged to incur new and additional indebtedness in order to find another place to live.

The Program was formulated to relieve to a limited extent the effects of the crushing financial burden thus placed upon homeowners. Under the Program one would absorb the physical damage to his home to the full amount of his equity interest in the property and pay $1,000 of the outstanding mortgage balance. The rest of the mortgage would be paid for from appropriated funds of the United States and the state. This would free the homeowner of the burden of a mortgage debt for a nonexistent or non-livable home and enable him to incur a new debt to purchase a new home.

We cannot say that the means chosen by the legislature to meet the effects of a natural disaster did not effect a public purpose. Relief and support of the poor has long been recognized as an obligation of government and a public purpose.[8] It is no less a public purpose to expend public moneys to relieve economic distress by aiding those persons in the state who have suffered a substantial financial burden as a result of a natural disaster.

■ The legislature chooses the means to effect a public purpose in the exercise of a broad discretion. The courts will not interfere with the exercise of that discretion unless it is clearly shown that the legislative determination that a public purpose will be served by the means chosen is arbitrary and without any reasonable basis in fact.[9]

■ There is no such showing here. The paramount purpose of the Program is the relief of those saddled with economic hardship. Any private advantage, such as to those holding mortgages on the damaged or destroyed homes, is incidental and subordinate. The fact that some private purpose may be derived from the Program will not alone invalidate it.[10] Nor is the concept of a public purpose negated by reason of the fact that the number of homeowners eligible for assistance is less than was anticipated at the time the Program was being formulated, or that the benefits of the Program are available only to the owners of one to four family dwellings with 60% or more damage. It is not essential that the entire community or any particular number of persons should benefit from remedial legislation in order that a public purpose be served. The purpose of the Program is no less public because its benefits may be limited by circumstances to a comparatively small part of the public.[11]

We hold that the Program effects a public purpose and is not in violation of article IX, section 6 of the state constitution.

*Equal Protection.*

The Program is limited in its application to those persons owning one to four family dwellings, encumbered by a mortgage or other real property lien incurred for the purpose of financing or refinancing the pur-

7. Roe v. Kervick, 42 N.J. 191, 199 A.2d 834, 846 (1964).

8. Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 515, 57 S.Ct. 868, 81 L. Ed. 1245, 1256–1257 (1937); Roe v. Kervick, supra note 7, 199 A.2d at 846.

9. DeArmond v. Alaska State Dev. Corp., 376 P.2d 717, 721 (Alaska 1962).

10. Roe v. Kervick, 42 N.J. 191, 199 A.2d 834, 849 (1964).

11. Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834, 840–841 (1938).

chase or improvement of the home, where the physical damage to the property was in excess of 60% of its fair market value immediately prior to the earthquake of March 27, 1964. Appellant contends that there is no reasonable basis for a distinction between the included class and those homeowners excluded by the limiting criteria, and therefore the Program denies equal protection of the laws.[12]

■ Before there could be a finding of a denial of equal protection, it would have to appear that the difference in application of the Program between those homeowners covered by it and those excluded from its coverage was the result of a deliberate and intentional plan to discriminate against the latter, or was based upon some unjustifiable or arbitrary classification.[13] If a rational basis for the classification reasonably may be conceived, there is no denial of equal protection.[14]

■ There is a rational basis for the distinction made between those covered by the Program and those not covered. As to the 60% damage limitation, the evidence showed that such figure was arrived at to cover losses that could not be adequately covered under the Small Business Administration Disaster Loan Program, and was based on an estimate as to the amount of indebtedness a homeowner could reasonably be expected to carry if he refinanced his existing mortgage indebtedness and borrowed money for the rehabilitation of his dwelling. In addition, the evidence showed that few, if any, mortgagors just barely missed qualifying under the 60% rule, since the damage to dwellings was either fairly minor or fairly major.

The limitation of the Program's benefits to owners of one to four family dwellings also has a reasonable basis. The evidence produced in the trial court showed that such persons constituted a distinct class of property owners, that is, those who build a dwelling for their own use and for the purpose of renting from one to three units, but who are not primarily engaged in the business of renting real property. Those who are primarily engaged in that business would be able to handle their earthquake losses under the Small Business Administration and tax adjustment programs. Similarly, the basis for not including business or commercial properties in the Program could have been the differences in income tax treatment between businesses and homeowners which made the Small Business Administration loan program attractive to businesses but unattractive to homeowners.

Finally, the Program is not constitutionally objectionable because it is limited to mortgage indebtedness incurred to finance or refinance the purchase or improvement of dwellings, and does not include a mortgage indebtedness incurred for some other purpose or an indebtedness not secured by a mortgage, such as a personal note. Such a choice of those who may benefit from the Program is not arbitrary. It is a matter of common knowledge that the usual and traditional method of financing the purchase or improvement of a home is by way of a mortgage or other lien device such as a deed of trust, and that in the vast ma-

12. The fourteenth amendment to the United States Constitution provides in pertinent part:
   * * * nor shall any State * * * deny to any person within its jurisdiction the equal protection of the laws.
   Alaska Const. art. I, § 1 provides in pertinent part:
   This constitution is dedicated to the principles * * * that all persons are equal and entitled to equal rights, opportunities, and protection under the law * * *.

13. Nelson v. State, 387 P.2d 933, 935 (Alaska 1964).

14. Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 509, 57 S.Ct. 868, 81 L.Ed. 1245, 1253 (1937); Metropolitan Cas. Ins. Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 79 L.Ed. 1070, 1073 (1935); Rast v. Van Deman & Lewis Co., 240 U.S. 342, 357, 36 S.Ct. 370, 60 L.Ed. 679, 687 (1916).

jority of instances where a home mortgage exists, the mortgage debt was incurred for the purpose of financing the purchase or improvement of the home and not for some other purpose such as the financing of a commercial enterprise.

In arguing that there is a denial of equal protection, appellant's basic contention is that the Program has not been extended as far as it might have been. Such an argument concedes that the Program is beneficial as far as it goes—the complaint being that it does not go far enough. But the demands of equal protection do not require that there be perfect equality and uniformity, or that the entire field of governmental action be covered by one legislative enactment.[15] As the United States Supreme Court has stated:

> [T]he legislature is not bound, in order to support the constitutional validity of its regulation, to extend it to all cases which it might possibly reach. Dealing with practical exigencies, the legislature may be guided by experience. * * * It is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. * * * If the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.[16]

We find nothing in the Program which contravenes the equal protection requirements of the federal and state constitutions.

*Payments to Lienors.*

■ The Alaska Mortgage Adjustment Plan provides that payments of mortgage debts under the Program shall be made directly to the lienors (mortgagees). Appellant claims that this provision is unlawful since chapter 1 provides in section 4 that the mortgagors, rather than the mortgagees, may apply for relief under the act.

We disagree with appellant. The provision in the Program for payment to lienors is merely a method of administering the Program, and probably the best method of assuring that appropriated funds will be used for the express purpose of reducing mortgage indebtedness. The Program was never intended as a grant of money to homeowners to be used as they wished, but was intended solely to reduce mortgage indebtedness. Furthermore, section 4 of chapter 1 provides that the Commissioner of Commerce "shall * * * prevent unjustified payments or gains to mortgagors or mortgagees." Payments of the amount of the mortgage indebtedness to the mortgagees, rather than to the mortgagors, helps to accomplish that purpose.

*Lien Coverage.*

Chapter 1 provides for the payment of home mortgage obligations or "other real property liens" secured by one to four family dwellings. The Mortgage Adjustment Plan prepared under the authority of chapter 1 provides that the following obligations are eligible for retirement or adjustment under the Program:

> a. Obligations (including special assessments for improvements but not including real property taxes) incurred * * * for the purpose of financing or refinancing the purchase or improvement of properties * * *.

Appellant contends that the inclusion of special assessments and the exclusion of real property taxes in the Mortgage Adjustment Plan is improper.

■ We disagree with appellant. A home mortgage obligation is generally incurred for the purpose of financing the purchase or improvement of one's home. The term "home mortgage obligation or

---

15. Middleton v. Texas Power & Light Co., 249 U.S. 152, 157–158, 39 S.Ct. 227, 63 L.Ed. 527, 531 (1919); Rosenthal v. People of State of New York, 226 U.S. 260, 270–271, 33 S.Ct. 27, 57 L.Ed. 212, 217 (1912).

16. Miller v. Wilson, 236 U.S. 373, 383–384, 35 S.Ct. 342, 59 L.Ed. 628, 632 (1915).

other real property lien" signifies that "other real property lien" would be of the same general nature or class as a home mortgage obligation, i. e., a lien on real property where one's home is situated which was incurred for the purpose of purchasing the property or improving it and thus enhancing its value. A special assessment is in the nature of an improvement enhancing the value of property, whereas a tax lien is not. It was not unreasonable to include special assessments and to exclude real property taxes in the Mortgage Adjustment Plan.

*Delegation of Legislative Power.*

■ Section 3 of chapter 1 provides that the Commissioner of Commerce shall:

[P]repare a plan to be submitted by the governor to the President of the United States for the implementation of the purpose of Section 57 of the "1964 Amendments to the Alaska Omnibus Act."

Appellant contends that such a provision in the statute unconstitutionally delegated legislative power to the Commissioner of Commerce, the Governor and the President, for the reason that the law did not become complete until those persons had acted.

There was no unconstitutional delegation of legislative power. The Commissioner of Commerce was required to prepare a plan which would effectuate the purposes of Section 57 of the 1964 Amendments to the Alaska Omnibus Act. The purposes and standards of Section 57 are explicit and detailed. The legislature has made

them binding upon the Commissioner. Such a limited delegation of legislative power, where adequate standards are provided, is permissible.[17]

*Deeds of Trust.*

Appellant acknowledges that deeds of trust are "home mortgage obligations or other real property liens", eligible for retirement or adjustment under the Program. Appellant argues, however, that where a deed of trust is involved no deficiency may be enforced against the debtor, and therefore a grant under the Program would pay a debt that the debtor is not obligated to pay, would amount to a gift of public funds to certain creditors, and would constitute an expenditure of public funds for a non-public purpose.

■ Appellant's argument is untenable. AS 34.20.100,[18] which deals with deeds of trust, prohibits a deficiency judgment only in the special instance where the trustee sells the property pursuant to the deed of trust without a court action on the obligation secured by the deed of trust. That the trustee has a choice of foreclosure or sale is clear under the provisions of AS 34.20.070 which provides that "the trustee, in addition to the right of foreclosure and sale, may execute his trust by sale of the property." If the trustee chooses not to sell the property but to foreclose, then under AS 09.45.170[19] he may commence a foreclosure action and obtain a judgment determining the personal liability of the debtor for the debt secured by the deed of

17. DeArmond v. Alaska State Dev. Corp., 376 P.2d 717, 723 (Alaska 1962) ; Boehl v. Sabre Jet Room, Inc., 349 P.2d 585, 588 (Alaska 1960).

18. AS 34.20.100 provides:
*Deficiency judgment prohibited.* When a sale is made by a trustee under a deed of trust, as authorized by §§ 70-130 of this chapter, no other or further action or proceeding may be taken nor judgment entered against the maker, his surety or guarantor, on the obligation secured by the deed of trust for a deficiency.

19. AS 09.45.170 provides:
*Judgment on foreclosure of lien.* A person having a lien upon real property, other than that of a judgment, whether created by mortgage or otherwise, to secure a debt or other obligation may bring an action to foreclose the lien. In the action, the court may direct the sale of the encumbered property or a portion of it and the application of the proceeds of the sale to the payment of costs, expenses of sale, and the amount due the plaintiff. The judgment shall also determine the personal liability of a defendant for the payment of the debt secured by the lien and be entered accordingly.

trust. Under the Program the payment of such a debt does not amount to the payment of an obligation which the debtor is not required to pay, and is not the expenditure of funds for a non-public purpose.

*Executive Order.*

The Mortgage Adjustment Plan provides that:

> The Commissioner of Commerce of the State of Alaska shall administer the program through an agency to be known as the "Alaska Mortgage Adjustment Agency" which he shall establish within the Department of Commerce.

Appellant contends that the creation of the Alaska Mortgage Adjustment Agency is a change in the organization of the executive branch of government requiring the force of law within the meaning of the Alaska Constitution, Article III, Section 23,[20] and therefore to be valid ought to have been set forth in an executive order of the Governor.

Appellant's position is untenable. The Commissioner of Commerce is authorized by chapter 1 to prepare a plan to implement the purpose of section 57 of the Alaska Omnibus Act, to enact rules and regulations and do all other things necessary to effectuate the purpose of chapter 1, and to hire, define the duties and fix the compensation of personnel necessary to effectuate the purpose of chapter 1.[21] The provision in the Mortgage Adjustment Plan for the establishment of the Alaska Mortgage Adjustment Agency was nothing more than a recognition of the fact that specific personnel would be charged with the responsibility of administering the Program under the Commissioner of Commerce. This was merely the fulfillment of the obligation of the Commissioner to "hire, define the duties, and fix the compensation of personnel necessary to effectuate the purposes" of chapter 1. It was in no sense the creation of an executive agency by the Governor in the course of making "changes in the organization of the executive branch"[22] of the state government.

*One Subject Rule.*

The Alaska Constitution, article II, section 13 provides:

> Every bill shall be confined to one subject. * * * The subject of each bill shall be expressed in the title.

The title of chapter 1 of the 1964 special session reads:

> Relating to a program of grants to homeowners whose property was destroyed or severely damaged by the effects of the earthquake of March 27, 1964; and providing for an effective date.

Appellant contends that the foregoing constitutional requirement has been violated for two reasons: (1) the title of chapter 1 is broader than the act itself in a way which is misleading and deceptive because the title indicates that all homeowners are covered, whereas in fact only a limited class are covered by the act, and (2) section 5 of chapter 1 imposes criminal sanctions[23]

20. Alaska Const. art. III, § 23 provides: The governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders. The legislature shall have sixty days of a regular session, or a full session if of shorter duration, to disapprove these executive orders. Unless disapproved by resolution concurred in by a majority of the members in joint session, these orders become effective at a date thereafter to be designated by the governor.

21. S.L.A.1964, ch. 1, § 3(b) (1)–(3) (First Special Session).

22. Alaska Const. art. III, § 23 set out in note 20 supra.

23. S.L.A.1964, ch. 1, § 5 (First Special Session) provides: A person who makes a false statement or misrepresentation knowing it is false or who knowingly fails to disclose a material fact, to obtain an increase of payment under the program established pursuant to this Act, either for himself or another person, upon conviction, is punishable by a fine of not more than $10,000, or by imprisonment

and thus the act is not confined to one subject.

■ The title of chapter 1 is not deceptive or misleading. It does not state, nor does it infer, that all homeowners are covered by the act. The legislature was not required to enumerate in the title the particular kinds or class of homeowners that were eligible for relief.

■ Nor does chapter 1 cover more than one subject. The purpose of the constitutional requirement that every bill be confined to one subject, like a similar provision in Alaska's Organic Act when it was a Territory,[24] is to prevent the inclusion of incongruous and unrelated matters in the same bill in order to get support for it which the several subjects might not separately command, and to guard against inadvertence, stealth and fraud in legislation. In construing such a provision, the court will disregard mere verbal inaccuracies, resolve doubts in favor of validity, and

> for not more than one year, or both. Each false statement or misrepresentation or failure to disclose a material fact is a separate offense.

24. Alaska Organic Act § 8, 37 Stat. 514 (1912).

hold that in order to warrant the setting aside of enactments for failure to comply, the violation must be substantial and plain.[25]

■ The provision for criminal sanctions in section 5 of chapter 1 does not amount to a separate subject of legislation unrelated to the subject expressed in the title of the act. Section 5 is fairly incidental to the general subject expressed in the title of grants to homeowners, because the effect of that section is to assure good faith compliance with the act. It was proper to include section 5 without special mention in the title of chapter 1.[26]

The superior court entered a judgment declaring that the Program was legal, constitutional and valid in every respect, and ordering that appellant's complaint be dismissed insofar as it contained a prayer for injunctive relief. That judgment is affirmed.

25. Griffin v. Sheldon, 78 F.Supp. 466, 11 Alaska 607, 615–616, 469–70 (D.Alaska 1948), rev'd on other grounds 174 F.2d 382, 12 Alaska 329, (9th Cir. 1949).

26. State v. Earley, 192 Kan. 144, 386 P.2d 221, 226 (1963).