**Abidin ZECIRI, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–1618.**

Court of Appeals of Alaska.

Sept. 1, 1989.

Rehearing Denied Sept. 18, 1989.

Margi Mock and Susan Orlansky, Asst. Public Defenders, and John B. Salemi, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, Chief Judge, COATS and SINGLETON, Judges.

## OPINION

SINGLETON, Judge.

Abidin Zeciri was convicted, following a jury trial, of the first-degree murder of his wife, Safije Zeciri. AS 11.41.100(a)(1). Zeciri's primary defense at trial was that his wife had killed herself and that the state's witnesses, Rasim and Katherine Kadriu, who originally reported the death as a suicide, altered their stories because the victim's family, particularly her brother, Mefail Aliu, threatened anyone who helped Zeciri at trial.

Zeciri did not testify. The defense presented this theory to the jury through cross-examination of the state's witnesses. Rasim and Katherine Kadriu offered conflicting testimony as to their knowledge of any rumors of threats. Rasim Kadriu testified that he had no knowledge of such threats. Rasim testified he did not speak with Aliu before changing his story and visiting Yugoslavia. Rasim acknowledged he spoke with Aliu while visiting Yugoslavia. Rasim also testified he visited Safije's grave with Aliu in Yugoslavia, but maintained they only spoke as friends. He denied discussing the case with Aliu while in Yugoslavia or at any other time until several weeks before the trial. At that time, he testified Aliu encouraged him to "tell just the truth."

Katherine Kadriu, on the other hand, testified that she was aware of a fear of Aliu within the Albanian community. Her understanding was that the fear was grounded on Aliu's threats to kill anyone helping Zeciri. She testified that her husband was also aware of this fear within the community. She also testified that she believed her husband had spoken to Aliu over the telephone while Aliu was in Yugoslavia, before Rasim's trip to Yugoslavia, thus contradicting her husband's testimony. Katherine specifically testified that she had discussed the rumors with her husband.

█ The defense attempted to call Glenn Starr, a criminal investigator for the Department of Immigration, to testify regarding reports from unidentified sources that these rumors existed. The defense wanted to introduce this testimony for two purposes: (1) to establish Rasim Kadriu's fear of Mefail Aliu in order to show a bias and motive to testify falsely and, (2) to impeach Rasim Kadriu's testimony denying that these rumors existed. Starr was prepared to testify that he had discussed the matter with six persons, two of whom told him that they were personally threatened by the victim's family. Starr was not willing to disclose the names of these people, though he indicated that four of the six were informants who had supplied him information in the past, and the two others who told him of the threats had provided information but were not "registered informants."

Starr was also ready to testify that Mefail Aliu and Shaip Kadriu had turned themselves into the immigration office upon their return to Anchorage from Yugoslavia, and that this was highly unusual. Starr had previously received reports that the men were returning to threaten Zeciri. Based on these reports, on the fact that the men did show up when the informant said they would, on their unusual behavior by turning themselves in upon entering the country, and on their reactions to being

sent to Los Angeles for a deportation hearing, Starr believed that they intended to harm someone. Zeciri apparently offered this testimony to support an inference that Aliu and Kadriu hoped to be placed in the same jail as Zeciri so that they could kill him.

Judge Buckalew refused to allow the testimony. He found that the connection between the conduct of Mefail Aliu and Shaip Kadriu, the rumors of threats in the Albanian community, and the witnesses in this case was "pretty thin." He had previously noted, however, that these threats justified precautionary measures and were the reason that the trial was held in the federal courthouse, where security was greater, rather than in the state courthouse.

On appeal, Zeciri contends that the trial judge erred in refusing the testimony. The parties differ over whether Starr's testimony constituted inadmissible hearsay and over whether refusing the testimony unduly restricted Zeciri's ability to establish bias. We first deal with the hearsay issue.

Zeciri argues that he was merely offering Starr's testimony to show the existence of rumors or reputation in the Albanian community, of which Rasim Kadriu was a part. The purpose of the evidence was to demonstrate that Rasim, despite his denials, had knowledge of the rumors, might have been frightened, and adjusted his testimony accordingly. *See* 2 Wigmore, *Evidence* § 245 at 49 (Chadbourn rev. 1979). Zeciri correctly points out that where utterances are offered merely to show the state of mind of a person who heard them, or to establish that someone must have heard them, and are not offered for the truth of the matter asserted, the hearsay rule is not violated. *See* A.R.E. 801; 6 Wigmore, *Evidence* § 1789 at 314–20 (Chadbourn rev. 1976).

There are problems with Zeciri's analysis. First, under the above rule, it is the existence of a rumor of threats, not the fact that threats actually existed, which must be proved to be true. However, Starr was not a member of the Albanian/Yugoslavian community where the rumors allegedly existed. Consequently, he would only know of the existence of rumors in that community through statements of unnamed informants. While the testimony of the informants themselves might not have been hearsay, Starr's repetition of the informant's statements would have been. Furthermore, part of Starr's testimony was going to be that two individuals reported they had been personally threatened. This is not evidence of rumor or reputation of threats; instead, it is evidence that personal threats were in fact made. Statements by two people that Aliu had threatened them, with nothing else to establish that the community was aware of the threats, would have been of little relevance. Even if the statements would not have been hearsay, Starr's repetition of them would have been hearsay, just as Starr's repetition of statements by the other informants would have been hearsay.

■ Even if Starr's testimony would not have been inadmissible hearsay, the trial judge was correct in refusing to admit the testimony on the basis of Alaska Evidence Rule 403 ("Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). We recognize Zeciri's argument that, by refusing Starr's testimony, the trial judge infringed on Zeciri's sixth amendment right to confront the witnesses against him. However, we have previously held that if Evidence Rule 403 is properly applied, there is no violation of a defendant's right to confront witnesses or to present evidence in the defendant's own behalf. *Larson v. State*, 656 P.2d 571, 575 (Alaska App.1982).

Because Starr was not a member of the Albanian/Yugoslavian community, he was not personally familiar with any rumors or discussions circulating within the community. Thus, he would not have been in a position to explain the circumstances of the rumors. His testimony, therefore, would not have enabled the jury to evaluate the likelihood that Rasim would in fact have heard the rumors and would have altered

his testimony because of them. Further, Starr's testimony would have been needlessly cumulative. The primary witness against Zeciri was Katherine Kadriu, who testified that she saw Zeciri shoot his wife. In contrast, Rasim testified that he heard the shot, ran into the room, and heard Safije accuse Zeciri of the offense. He also testified he saw Zeciri with the handgun and saw him rapidly dispose of it. It is clear that Rasim's testimony is primarily valuable to the state as corroboration of Katherine's testimony. Katherine, however, readily admitted hearing rumors and, in fact, testified that she discussed them with her husband. Under the circumstances, Starr's testimony would clearly have been cumulative of Katherine's.

The trial court did not err in concluding that the probative value of Starr's evidence was outweighed by possible confusion of issues or needless presentation of cumulative evidence. The trial court was also correct in concluding that Starr's unwillingness to disclose his informants' names would have made it very difficult for the state to reasonably cross-examine Starr and determine the likelihood that Rasim would in fact have been privy to the matter included within the informants' declarations.[1]

■ Zeciri next argues that the court committed several errors concerning an article which ran in a local paper while the jury was deliberating before reaching a verdict. After the closing arguments on Friday, November 1, 1985, Judge Buckalew read the standard instructions, including an instruction to consider only the evidence admitted at trial in reaching a verdict. The court did not repeat an admonition, frequently given during the trial, forbidding the jury from reading the newspapers or listening to news broadcasts. The jury then retired for deliberations. The jury later recessed for the evening and went home without any further admonitions not to read the newspapers.

On Saturday, November 2, an article appeared on the front page of the Anchorage Daily News, entitled "Albanian 'Avengers' deny vendetta over killing." The article was based on an interview with Mefail Aliu and Shaip Kadriu. Both expressed bewilderment at the accusations by the defense that they were threatening Zeciri or anyone who assisted him at trial. The article also presented facts which the trial court had found inadmissible when offered by the defense through Starr, specifically that six "tipsters" had informed the immigration office that the men were "bent on revenge." The article did not mention Katherine or Rasim Kadriu by name but did note that Shaip Kadriu's brother and sister-in-law were in the apartment when Safije was shot and that both were called as witnesses during the trial. The article did not criticize Zeciri. It mentioned that his daughter was staying with Mefail and Sharon Aliu and that Sharon would bring the child to the jail so that Zeciri could play with her.

The jury returned to deliberate on Saturday, the day the article was published, but failed to reach a verdict. When the jurors separated on Saturday night, no new admonition regarding publicity was given to them. The jury did not deliberate on Sunday. They resumed deliberations on Monday, and returned a verdict of guilty of murder in the first degree. We had originally remanded Zeciri's appeal for an evidentiary hearing to determine at what point defense counsel and the defendant first learned of the existence of the article. See Zeciri v. State, Memorandum Opinion and Judgment No. 1595 (Alaska App., April 20, 1988). On remand, it became clear that defense counsel did in fact know of the article before the jury completed its deliberations and that Zeciri was also aware of the article.

Defense counsel read the article the day it was published. She considered whether to contact the trial judge and have the jury voir dired to determine whether any juror

---

**1.** Whether Mefail Aliu had made threats against Zeciri or others was not independently relevant in this case. Its relevance depended on Rasim's awareness of the threats. Thus, it would appear that Starr's speculation about Mefail's turning himself in to immigration authorities as indicating an intent to kill Zeciri would have been only marginally relevant to this case.

had seen it, but decided against this tactic, hoping the jurors would not be exposed to the article. Defense counsel decided to wait and see if the jurors had seen it, and had assumed that "we'll hear about it if they do." When the verdict of guilty came in, defense counsel asked for the opportunity to talk to the jurors. She did not, however, disclose the existence of the article to the judge nor did she specifically request an opportunity to interrogate the jurors regarding possible exposure to the article. The trial judge denied the request to talk to the jurors. Defense counsel filed a "Motion for New Trial" or, in the alternative, a "Motion to Interview or Voir Dire Jurors" eight days after the verdict, contending that the trial court erroneously failed to admonish the jurors during deliberations not to discuss the case when they separated, in violation of Alaska Criminal Rule 27(e)(2). The motion also raised for the first time the appearance of the "Albanian Avenger" article during deliberations. Judge Buckalew denied the motion on November 26, 1985, without a hearing or written finding.

In *Owens v. State*, 613 P.2d 259 (Alaska 1980), the Alaska Supreme Court set out the procedure which the defense must follow when faced with trial publicity. There the court held:

> An accused may not withhold an objection to publicity occurring during a trial until an adverse verdict has been returned. This procedure would permit him to take a gambler's risk and complain only if the cards fell the wrong way. If the trial judge becomes aware of the publicity and orders a mistrial sua sponte, the hazard exists of a claim of double jeopardy on a retrial.

*Id.* at 261 (quoting *Mares v. United States*, 383 F.2d 805, 808 (10th Cir.1967), *opinion after remand*, 409 F.2d 1083 (10th Cir. 1968), *cert. denied*, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969). The supreme court continued:

> Some action by the defense, either a mistrial motion or a request for examination of the jury, is necessary in order to allow the trial judge to consider whether a declaration of mistrial is in fact appropriate, or whether a cautionary instruction to the jury will suffice to counteract its exposure to the out-of-court publicity or information. Ordinarily the absence of such action by the defense will waive the defendant's right to assert the error on appeal.

*Id.* (footnote omitted). The court went on to conclude that despite such a waiver, a defendant could still complain of plain error. *Id.* at 261–62.

By failing to bring the article to the trial court's attention while the jury was still deliberating, Zeciri lost the right to complain of the issue on appeal, unless he can show plain error. We agree with Zeciri that the trial court should have permitted him after-the-fact access to the jurors in order to show, if he could, that plain error existed. Because that was not done, we have no way of knowing whether any jurors were in fact exposed to the article. We will therefore assume that one or more jurors did in fact review the article.

In *Owens*, the supreme court cautioned that jurors' own assessment of their bias after being exposed to extra-judicial material during a trial is generally unreliable. *Owens*, 613 P.2d at 262 n. 6. The supreme court suggested that courts must look objectively at the issue to determine whether any probable prejudice existed. When we do so in Zeciri's case, we are satisfied that plain error would not be established even if the jurors had seen the article.

We note that the article did not disparage Zeciri personally, as might an article disclosing a suppressed confession or disclosing an extensive criminal record. At most, the article undermined Zeciri's attempts to discredit Rasim's testimony that he had not heard rumors that Mefail would injure those who helped Zeciri. As we have noted, however, the primary testimony against Zeciri came from Katherine Kadriu, who admitted that she had heard such rumors and had discussed them with her husband. In any event, jurors would naturally expect Mefail Aliu to deny that he intended to kill someone, regardless of his true intention. In summary, we are satis-

fied that the article, while unfortunate in its timing, was not so substantially prejudicial that possible juror exposure to it constituted plain error. We are satisfied that a timely objection or request for an instruction by Zeciri would have produced an admonition from the court to the jury that would have cured any error even if every member of the jury had seen the article. Consequently, we conclude that Zeciri has failed to establish plain error.

Zeciri next argues that the trial court erred in denying his motion for a new trial. Ten months after the trial, the defense filed a motion for new trial based on newly discovered evidence. Judge Buckalew held two evidentiary hearings in August and September 1986, at which two Albanian friends of Rasim Kadriu, Lee Rashad Shaboni and Camille Kadriosky, testified. Shaboni testified that Rasim Kadriu came to his house two days after Safije Zeciri died and said that Abidin Zeciri had not killed his wife. Shaboni also testified that he spoke to Rasim again later in Bethel, in Rasim Kadriu's taxicab. Shaboni asked Rasim why he changed his story. Rasim told Shaboni that he was afraid of the victim's brothers and that he was afraid that his family would be killed. Shaboni also testified, "Dino [Zeciri], you know, he's scared him, and, you know, he have to change his story." According to Shaboni, Rasim again told Shaboni that Zeciri did not kill his wife, but he did not say that she shot herself or that anyone else killed her.

Kadriosky testified he also encountered Rasim in Bethel in Rasim's cab. Rasim told him that Zeciri was in the room watching television with him when Safije Zeciri shot herself. Kadriosky further testified that Rasim told him that Safije Zeciri killed herself because she was jealous of Zeciri's other women friends.

■ Judge Buckalew denied the motion for a new trial, finding that the witnesses were not particularly credible and that the defense had not satisfied the requirements of *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962). Those requirements are:

1. The [new] evidence was discovered after the trial;

2. the motion should allege facts which indicate the movant's diligence;

3. the evidence relied on may not be merely cumulative or impeaching;

4. the evidence must be material to the issues in the trial;

5. the evidence must be likely to produce an acquittal upon a new trial.

*Id.*

■ Judge Buckalew found that Zeciri had failed to satisfy the first, third, and fifth prongs of this test. First, he found that neither of the two witnesses were particularly credible. Judge Buckalew found that Shaboni was the more believable of the two witnesses, but that his testimony did not refute any of the material facts presented in Rasim Kadriu's testimony at trial. Therefore, Judge Buckalew found that Rasim did not actually recant his testimony. He found that no new evidence was discovered because the marginally credible witness did not testify that Rasim said that he had lied at trial, or that Safije committed suicide. Shaboni's testimony is somewhat confusing and is open to the interpretation that Rasim merely told Shaboni that he did not witness Zeciri shoot his wife. This would be consistent with Rasim's testimony at trial. Thus, the first prong was arguably not satisfied because no "new" evidence was offered.

Judge Buckalew further found that the testimony of either witness would only impeach Rasim Kadriu. Because there were numerous impeachments of Rasim at trial based on his differing statements to the police, this evidence would be cumulative. Thus, the third prong was not satisfied. Finally, Judge Buckalew found that the evidence would not have resulted in a probable acquittal, considering that Zeciri had an apparent motive, Safije had no motive to kill herself, and an eyewitness, Katherine Kadriu, testified to the killing. Thus, the fifth prong was not satisfied.

Judge Buckalew sat through the trial and saw the witnesses testify. He also conducted an evidentiary hearing and had an opportunity to consider the credibility of the witnesses offering the alleged newly

discovered evidence. He was in the best position to weigh their credibility against the strength of the state's case. *See Gonzales v. State*, 691 P.2d 285, 286 (Alaska App.1984). His finding that the evidence would not have resulted in acquittal at retrial was not an abuse of discretion, particularly considering the nature of the evidence. *See Nygren v. State*, 616 P.2d 20, 22 (Alaska 1980); *Gonzales*, 691 P.2d at 286.

The judgment of the superior court is AFFIRMED.