Bobby R. RAGSDALE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7485.

Court of Appeals of Alaska.

June 1, 2001.

---

8. *See Linne v. State,* 674 P.2d 1345, 1356 n. 8 (Alaska App.1983).

David W. Rosendin, Ketchikan, for Appellant.

Douglas H. Kossler, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Bobby R. Ragsdale was convicted of second-degree sexual assault under AS 11.41.420(a)(3) for engaging in sexual penetration with a woman who was so intoxicated that she was either incapacitated or unaware of the sexual penetration.

On appeal, Ragsdale argues that the current definition of second-degree sexual assault was enacted in violation of the Alaska Constitution's "single subject" clause (Article II, Section 13). Ragsdale also contends that the definition of second-degree sexual assault is unconstitutionally vague.

In addition, Ragsdale contends that the trial judge committed two errors that require reversal of his conviction. Ragsdale was indicted for second-degree sexual assault under alternative theories: that his victim was either "incapacitated" (paragraph (3)(B) of the statute) or "unaware that a sexual act [was] being committed" (paragraph (3)(C) of the statute). Ragsdale argues that the jury should have been instructed that they could not convict him unless they unanimously agreed on one (or both) of these theories. Finally, Ragsdale contends that the trial judge committed error when the judge ruled

that a proposed expert witness offered by the defense did not have sufficient expertise to testify.

For the reasons explained here, we reject each of these contentions and we affirm Ragsdale's conviction.

*The legislature did not violate the "single subject" clause of the Alaska Constitution when they amended the definition of second-degree sexual assault in 1997*

As explained above, Ragsdale was charged with second-degree sexual assault under AS 11.41.420(a)(3), which forbids sexual penetration with a person who the defendant knows is either "incapacitated" or "unaware that a sexual act is being committed". The definition of "incapacitated" is codified in AS 11.41.470(2). Prior to 1997, "incapacitated" was defined to mean:

> temporarily incapable of appraising the nature of one's own conduct *and* physically unable to express unwillingness to act[.]

But in 1997, in section 7 of chapter 63 of the session laws, the legislature amended this definition by changing the word "and" to "or". The definition now reads:

> temporarily incapable of appraising the nature of one's own conduct *or* physically unable to express unwillingness to act[.]

Ragsdale asserts that this amended definition of "incapacitated" and, indeed, all other provisions of SLA 1997, chapter 63 were enacted illegally. Ragsdale's argument rests on the "single subject" provision of the Alaska Constitution.

Under Article II, Section 13 of our state constitution, "[e]very bill shall be confined to one subject".[1] Ragsdale points out that SLA 1997, chapter 63 was entitled:

> An act relating to the rights of crime victims and victims of juvenile offenses; relating to the collection by victims of restitution from prisoners; relating to the definition of "incapacitated" for sexual offenses; creating the crime of interfering with a report of a crime involving domestic violence; relating to the safety of vic-

---

1. Two types of legislation are exempted from this requirement: "appropriations bill[s]" and bills

"codifying, revising, or rearranging existing laws".

tims, other persons, and the community in setting bail or conditions of release; relating to access to certain records of the Violent Crimes Compensation Board; amending Rules 6 and 43(d), Alaska Rules of Criminal Procedure, Rules 404 and 615, Alaska Rules of Evidence, and Rule 3, Alaska Delinquency Rules; and providing for an effective date.

Ragsdale argues that a bill affecting so many provisions of law necessarily violates the "single subject" clause. But prior Alaska cases on this issue do not support Ragsdale's position.

■■■ The "single subject" rule was intended to prohibit legislative "log-rolling"— the practice of "inclu[ding] incongruous and unrelated matters in the same bill in order to get support for it which the several subjects might not separately command".[2] But this constitutional prohibition must be construed narrowly, tempered by "practicality and reasonableness"[3], so as not to unduly restrict the scope of legislation.

> All that is necessary is that the act should embrace some one general subject; and [this means], merely, that all matters treated ... should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be part of, or germane to, one general subject.

*Gellert v. State*, 522 P.2d 1120, 1123 (Alaska 1974).

Thus, the Alaska Supreme Court upheld an act that contained disparate provisions all somehow related to "land".[4] The court also upheld an act that contained various provisions all related to "taxation".[5] And the court upheld a voter initiative in which all provisions were related to "transportation".[6]

In *Galbraith v. State*[7], this court rejected a single-subject challenge to a session law which declared that it was addressing:

> the reclassification of sexual assault in the first degree; the rewriting of assault law to eliminate the defense of intoxication; establishing presumptive sentences for all class A felony offenders; the issuance of telephonic search warrants; the modification of procedures for disposal of seized and recovered property; the complete modification of the insanity defense; the modification of the defense of necessity; the reclassification of second offense joyriding; the legitimation of use immunity; and substantial modifications to the manner in which sentences are imposed and modified.

*Galbraith*, 693 P.2d at 885 n. 7. Even though the only subject that tied these strands together was a very broad one ("criminal law"), we nevertheless upheld the challenged session law against this constitutional attack.[8]

■■■ Given our decision in *Galbraith*, and the decisions of the supreme court on which *Galbraith* is based, we reject Ragsdale's "single subject" challenge to SLA 1997, chapter 63. Thus, the legislature lawfully enacted the 1997 amendment to the definition of "incapacitated".

*The definition of second-degree sexual assault codified in paragraph (a)(3) of AS 11.41.420 is not unconstitutionally vague*

Under paragraph (a)(3) of AS 11.41.420, a person commits the crime of second-degree sexual assault if they engage in sexual penetration with another person who they know is mentally incapable, or incapacitated, or unaware that a sexual act is being committed. Ragsdale argues that this portion of the statute violates the constitution because the definition of "incapacitated" is so vague as to

---

**2.** *Suber v. Alaska State Bond Committee*, 414 P.2d 546, 557 (Alaska 1966).

**3.** *Van Brunt v. State*, 646 P.2d 872, 874 (Alaska App.1982) (quoting *Gellert v. State*, 522 P.2d 1120, 1123 (Alaska 1974)).

**4.** *See State v. First Nat'l Bank of Anchorage*, 660 P.2d 406, 414–15 (Alaska 1982).

**5.** *See North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 544–46 (Alaska 1978).

**6.** *See Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173, 1181 (Alaska 1985).

**7.** 693 P.2d 880 (Alaska App.1985).

**8.** *See id.* at 886.

leave reasonable people guessing about its meaning.[9] Alternatively, Ragsdale argues that even if the definition of "incapacitated" can be understood, it is fundamentally unfair to convict a person of a felony for failing to perceive that their sexual partner has crossed the line from "intoxicated and uninhibited" to "intoxicated and incapacitated". In this section, we address the alleged vagueness of the term "incapacitated".

As explained in the previous section of this opinion, AS 11.41.470(2) defines "incapacitated" to mean "temporarily incapable of appraising the nature of one's own conduct or physically unable to express unwillingness to act[.]" Ragsdale contends that the phrase "incapable of appraising the nature of one's own conduct" embodies a concept that defies objective evaluation.

Ragsdale suggests that the task of appraising the nature of human conduct involves "a number of levels of abstraction". He argues that, if this task is taken seriously, very few people (if any) can appraise the true "nature" of their conduct because they remain unaware of their inner motivations, they do not appreciate the impression they are making upon others, and they fail to foresee the long-term consequences of their actions.

On a philosophical level, Ragsdale is undoubtedly correct. But we do not think that the legislature intended its definition of the crime to require this type of philosophical inquiry. We presume that the legislature would share Ragsdale's view that it is almost impossible for a person to truly assess the ultimate sources and the ultimate consequences of their conduct. But because of this, we further presume that the legislature did not intend to define the crime of second-degree sexual assault in such a way as to require an answer to this imponderable question—since defining the crime in this manner would require acquittal in all cases.

Rather, we conclude that the legislature intended the jury to undertake a more mod-est inquiry. In *King v. State*[10], we addressed the meaning of the phrase "temporarily incapable of appraising the nature of one's conduct" in the context of a second-degree sexual assault prosecution. We declared that this phrase required the jury to determine whether the victim was temporarily "incapable of understanding that she was engaged in sexual penetration with [the defendant]." [11]

We implicitly applied this same definition in *Wilson v. State*.[12] In *Wilson*, the evidence showed that the victim of the sexual assault was heavily intoxicated, to the point of passing out. Nevertheless, we held that the evidence could not legally support a finding of the victim's incapacity. We agreed with the State that

> even if the evidence supported a finding that G.J. had passed out from intoxication prior to entering Wilson's vehicle, it would not support a finding that G.J. remained unconscious at the time she performed fellatio on Wilson. [A witness] testified that G.J. resisted having her clothes removed. G.J. testified that she resisted Wilson's assault. She testified that she was aware of what was happening to her, and told him "don't" during the sexual contact. Following the assault, G.J. was coherent enough to accurately memorize the truck's license plate number.
>
> In contrast, Wilson's testimony was that G.J. verbally consented. He said that G.J. was "coming on to" him, and that she voluntarily removed her clothes and assisted him in the sexual act. In his words: "She proceeded in giving me oral sex."
>
> [Even c]onstruing all of the testimony most favorably to Wilson, G.J. was not temporarily incapable of appraising the nature of her conduct, nor was she physically unable to express unwillingness to act.

*Wilson*, 670 P.2d at 1152.

■ We reiterate our holding in *King*. The question of whether a victim was "incapacitated" for purposes of a second-degree sexual

---

9. *See Jackson v. State*, 890 P.2d 587, 594 (Alaska App.1995) (a statute is void for vagueness "when it is so imprecise that ordinary persons of common intelligence are left to guess at its meaning and are apt to differ as to its scope").

10. 978 P.2d 1278 (Alaska App.1999).

11. *Id.* at 1280.

12. 670 P.2d 1149 (Alaska App.1983).

assault prosecution is equivalent to the question of whether the victim was temporarily incapable of understanding that they were engaged in sexual penetration with the defendant. (Compare this with the legislature's definition of "mentally incapable" found in AS 11.41.470(4), which requires the jury to assess whether the victim was "incapable of understanding the nature *or consequences* " of their conduct.)

Construed in this fashion, the phrase "temporarily incapable of appraising the nature of one's own conduct" meets the constitutional standards for definiteness. We therefore reject Ragsdale's attack on the constitutionality of the definition of "incapacitated" as that term is used in the second-degree sexual assault statute.

*The definition of second-degree sexual assault codified in paragraph (a)(3) of AS 11.41.420 does not violate the guarantee of due process of law*

As explained above, Ragsdale also argues that even if the definition of "incapacitated" is definite enough to be constitutional, the second-degree sexual assault statute still denies defendants due process of law. Ragsdale contends that morally blameless people can be convicted of this crime because the definition of incapacity focuses solely on the victim's mental condition and disregards the defendant's *perception* of the victim's mental condition. Thus, Ragsdale argues, a person could be convicted of second-degree sexual assault even when, despite reasonable attentiveness and good faith, they failed to perceive that their sexual partner's level of intoxication had crossed the line into "incapacity" (*i.e.,* temporary inability to comprehend that they were engaged in sexual penetration).

Ragsdale's argument misapprehends the definition of second-degree sexual assault under paragraph (a)(3). Under this portion of the statute, the crime is committed if "the offender engages in sexual penetration with a person *who the offender knows* is . . . incapacitated". Thus, to prove second-degree sexual assault, the State must establish (1) that the defendant engaged in sexual pen-

etration with the victim, (2) that the victim was incapacitated, *and* (3) that the defendant *knew* that the victim was incapacitated.

■ Under AS 11.81.900(a)(2), a defendant acts "knowingly" with respect to a circumstance if the defendant either "is aware . . . that the circumstance exists" or "is aware of a substantial probability [that the circumstance exists], unless the [defendant] actually believes it does not exist". In other words, to prove second-degree sexual assault under paragraph (a)(3) of the statute, the State is obliged to show that the defendant knew that their sexual partner was incapacitated or, alternatively, that the defendant was aware of a substantial probability that their sexual partner was incapacitated and the defendant did not actually believe otherwise (*i.e.,* did not actually believe that their sexual partner *was* capable of understanding that they were engaged in sexual penetration).

We therefore reject Ragsdale's due process challenge to the definition of second-degree sexual assault.

*Ragsdale's jury did not have to unanimously agree on whether his victim was (1) incapacitated or (2) unaware that a sexual act was being committed, so long as the jurors unanimously agreed that at least one of these theories was proved*

As noted earlier, Ragsdale was indicted for second-degree sexual assault under alternative theories: that he engaged in sexual penetration with a person who he knew was "incapacitated" (paragraph (3)(B) of the statute), and that he engaged in sexual penetration with a person who he knew was "unaware that a sexual act [was] being committed" (paragraph (3)(C) of the statute). Ragsdale argues that the jury should have been instructed that they could not convict him unless they unanimously agreed on which of these theories the State had proved.

■ As we recognized in *King v. State,* subsections 3(B) and (3)(C) overlap; they may both apply to the same set of facts.[13] For example, in *King,* we held that both subsections might be proved if the victim was

**13.** 978 P.2d 1278, 1281 (Alaska App.1999).

asleep during the assault.[14] But we concluded that this overlap "[did not] suggest that the legislature wished one subsection to be applied to the exclusion of the other."[15] Thus, when a victim's unawareness of sexual activity stems from unconsciousness or the oblivion of extreme intoxication, a jury might lawfully conclude that both subsections are proved.

██ Nevertheless, even if some or all of the jurors in Ragsdale's case concluded that the State had proved only one of these subsections, the jurors did not need to reach unanimous agreement concerning which theory of prosecution was proved. A jury ordinarily does not have to agree on a single interpretation of the facts of a particular criminal episode.[16] When a statute defines two or more circumstances in which the defendant's conduct constitutes a crime, the defendant may lawfully be convicted if each juror concludes that at least one of these circumstances has been proved.[17]

██ We therefore conclude that Ragsdale could lawfully be convicted of second-degree sexual assault even though the jurors may not have reached unanimous agreement as to whether Ragsdale engaged in sexual penetration (a) with a person who he knew was incapacitated, or (b) with a person who he knew was unaware that sexual penetration was occurring. The trial judge properly refused to instruct the jurors that they must reach unanimous agreement on this issue.

*Ragsdale's jury did not have to unanimously agree on which act of sexual penetration constituted the actus reus of his crime*

In an ancillary claim, Ragsdale asserts that the jurors may not have reached unanimous agreement regarding the act of sexual penetration that constituted the *actus reus* of his crime. Ragsdale contends that the evidence presented at his trial revealed that he engaged in two separate acts of sexual penetration with the victim, one when she lay underneath him and one when she was on top of him. Ragsdale argues that the jury could not lawfully convict him unless they reached unanimous agreement as to which of these acts of sexual penetration constituted the *actus reus* of his crime.

Ragsdale did not raise this claim at trial. He must therefore show that the trial judge's failure to instruct the jury on this issue, *sua sponte*, constitutes plain error. That is, Ragsdale must show that the trial judge's failure to instruct the jury on this point, even without a request, was an error that would have been obvious to any competent judge or attorney, and that this error manifestly prejudiced the fairness of Ragsdale's trial.[18]

The only arguable reference to two separate acts of penetration is found in Ragsdale's testimony on direct examination. Ragsdale testified that he first lay on top of his victim, and that she later got on top of him. But Ragsdale testified that he did not penetrate the victim when he lay on top of

---

**14.** *See id.*

**15.** *Id.*

**16.** *See Baker v. State,* 905 P.2d 479, 489 (Alaska App.1995) (in a prosecution for robbery, the jurors did not need to unanimously agree on whether the defendant (as opposed to one of his co-robbers) was the one who actually struck the victim); *Norris v. State,* 857 P.2d 349, 354 (Alaska App.1993) (in a prosecution for second-degree murder, the jurors did not need to unanimously agree on whether the defendant purposely fired his rifle at the victim or, instead, whether the victim grabbed the pointed rifle and it discharged by accident).

**17.** *See State v. James,* 698 P.2d 1161, 1165–66 (Alaska 1985) (when "only one criminal act [is] alleged and only one incident [is] involved", the jurors must agree that the defendant committed the act, but they need not agree on which clause of the statute this act violated). Some cases applying this principle are: *Ward v. State,* 758 P.2d 87, 92 (Alaska 1988) (jurors need not be unanimous as to whether the defendant drove a motor vehicle while intoxicated or drove a motor vehicle while his blood alcohol level was .10 percent or greater); *Totemoff v. State,* 866 P.2d 125, 129 (Alaska App.1993) (jurors need not be unanimous as to whether the defendant acted as a principal or an accomplice in the illegal taking of deer).

**18.** *See Massey v. State,* 771 P.2d 448, 453 (Alaska App.1989); *Potts v. State,* 712 P.2d 385, 394 n. 11 (Alaska App.1985); *Carman v. State,* 658 P.2d 131, 137 (Alaska App.1983); *Marrone v. State,* 653 P.2d 672, 675–681 (Alaska App.1982).

her, and that the only act of sexual penetration occurred when she got on top of him. Ragsdale asserted that, while this act of penetration continued, he switched places with the victim (so that he was again on top), but even under Ragsdale's version of events, there was still only one act of penetration. It therefore appears extremely unlikely that the jurors could have split on when and how penetration occurred.

▮ Moreover, even if the jury conceivably might have concluded that Ragsdale penetrated his victim twice, these two acts of penetration clearly comprised one course of conduct for purposes of the sexual assault statute. Both were acts of genital penetration, and they occurred within minutes of each other. They therefore constituted one act of sexual assault.[19]

For these reasons, Ragsdale has not shown plain error.

*The trial judge did not abuse his discretion when he ruled that Ragsdale's proposed expert witness lacked the expertise to offer an opinion on the subject of alcoholic blackouts*

Ragsdale's final claim on appeal is that the trial judge improperly prevented him from presenting the testimony of Bruce Dixon, an outpatient alcohol counselor. The defense offered Dixon as an expert on the phenomenon known as "alcoholic blackout". Ragsdale wanted to present Dixon's testimony to support the defense theory that the victim of the sexual assault had experienced an alcoholic blackout on the evening of the assault.

(The victim testified that she did not remember getting into bed with Ragsdale and did not remember having sexual intercourse with him. Ragsdale contended that the victim had affirmatively consented to the sexual intercourse, but he suggested that she might have been experiencing an alcoholic blackout when she gave her consent—so that she no longer remembered the incident.)

*(a) Ragsdale's two offers of proof, and Dixon's voir dire testimony*

Ragsdale's attorney offered an elaborate description of Dixon's proposed testimony. The defense attorney told Superior Court Judge Thomas M. Jahnke that Dixon would testify (1) that "blackout is something that sometimes happens when certain people ingest a certain level of alcohol"; (2) that "in late-stage alcoholics, it sometimes takes very little alcohol to go into an alcoholic blackout"; (3) that "[even] a first-time user of alcohol [can sometimes] go into a blackout"; (4) that "somebody in an alcoholic blackout will have no recollection of anything that took place while they were in the alcoholic blackout"; (5) that while a person is in an alcoholic blackout, "they can engage in routine activities, for example, ... driv[ing] a car [or] carry[ing] on a conversation in [a] business meeting ... and [still] not have any recollection at all [of these activities]"; and (6) that "even people who know them pretty [well] won't realize that they're in an alcoholic blackout".

The prosecutor conceded that Dixon qualified as an expert in the field of counseling people who suffered from alcohol abuse or alcoholism, but the prosecutor challenged Dixon's qualification to give expert testimony on the subject of alcoholic blackout. The prosecutor's objection led to a *voir dire* examination of Dixon regarding his experience and qualifications. Dixon's *voir dire* testimony failed to support the defense attorney's offer of proof.

Dixon testified that his prior knowledge of alcoholic blackouts was limited, but he declared that he had spent some time studying this phenomenon after Ragsdale's attorney contacted him about testifying at Ragsdale's trial. Dixon stated that, in response to the defense attorney's inquiry, he had spent ap-

---

19. *See Erickson v. State,* 950 P.2d 580, 587 (Alaska App.1997); *Yearty v. State,* 805 P.2d 987, 995 (Alaska App.1991) (when a defendant inflicts distinct types of sexual penetration upon a victim during a single episode of sexual assault, each distinct type of sexual penetration will support a separate count of sexual assault); *see also Os-* *wald v. State,* 715 P.2d 276, 280–81 (Alaska App. 1986) (holding that two acts of genital intercourse with the same victim would not support separate convictions for sexual abuse of a minor unless these acts of penetration were separated by a substantial break in time and circumstance).

proximately one hour on the Internet searching for information about alcoholic blackouts, and he had also found fifteen journal articles that referred in some fashion to blackouts.

Dixon told the court that "a lot of [his] general training [as an alcohol counselor] would apply to the topic of blackout." However, Dixon qualified this statement by declaring that he had not spent much time researching blackouts as such. Moreover, Dixon told the court that, from what he knew, there was considerable debate concerning the definition of "alcoholic blackout" and the nature of this phenomenon. He stated that the etiology and characteristics of an alcoholic blackout were "not very well established"—that "[t]here's a lot that's not known about the phenomenon of a blackout".

Dixon told the court that he had counseled "many, many clients" who claimed to have experienced an alcoholic blackout. But at the same time, he informed the court that "there just has not been a whole lot done [to study this phenomenon].... [I]t's not really known exactly what the process is."

After hearing this *voir dire* testimony, Superior Court Judge Thomas M. Jahnke stated that he was not inclined to allow Dixon to testify as an expert witness on the subject of alcoholic blackouts for three reasons. First, Judge Jahnke was concerned that the "anecdotal evidence" of alcoholic blackouts did not sufficiently establish that the phenomenon really occurred. Second, the judge was not convinced that Dixon's background qualified him to give an expert opinion on the subject of alcoholic blackouts. Third, even assuming that Dixon was qualified to testify in a general way about the professional debate over the source and nature of alcoholic blackouts, Judge Jahnke was concerned that this type of testimony would be more prejudicial than probative. He expressed concern that Dixon's testimony would only engender confusion of the issues and invite the jury to speculate about alcoholic blackouts when Dixon could not provide the jurors with any objective basis for determining whether the victim in Ragsdale's case had experienced an alcoholic blackout.

█ The record supports Judge Jahnke's ruling. Dixon's *voir dire* testimony failed to establish that he was competent to testify about most of the topics mentioned by the defense attorney in his offer of proof. In fact, Dixon essentially declared that he could *not* testify about most of these topics. Dixon admitted that he had not spent much time studying this topic. He also told the court that the phenomenon of alcoholic blackouts was not well understood. Dixon disclaimed any expertise on the questions of how or why alcoholic blackouts occurred, or what their defining characteristics were.

Later that day, the defense attorney brought Dixon back to court for additional *voir dire*. At this time, Ragsdale's attorney scaled back his offer of proof. He told Judge Jahnke that the purpose of this *voir dire* was to convince the court only that Dixon should be allowed to testify about "what an alcoholic blackout is". The defense attorney disclaimed any intention to have Dixon testify about "whether or not [the victim] was in an alcoholic blackout on the day in question, or anything about this particular case".

Dixon then testified (on *voir dire* ) that he had consulted twelve different books in his efforts to research alcoholic blackouts. Two of the books did not discuss blackouts at all. Of the remaining ten, three of the books had three or four pages devoted to the subject, while the other seven books had only "some reference" to the subject or offered only a definition of the term.

Dixon also testified that he had taken 500 hours of training to become a certified alcohol counselor. According to Dixon, four of his courses had included "some reference" to or "some discussion" of alcoholic blackouts.

Following this supplemental *voir dire*, Judge Jahnke ruled again that Dixon would not be allowed to testify. Judge Jahnke pointed out that, under Ragsdale's new, scaled-back offer of proof, Dixon's testimony was being offered simply as a "conduit for [apprising the jury of] the definitions [of alcoholic blackout] that are presented in a number of learned treatises". The judge noted that Dixon did not claim to have expertise "in diagnosing [alcoholic] blackout [or in] differentiating [alcoholic] blackout from other phenomena". Thus, even if Dixon took the

stand and repeated the various textbook definitions of alcoholic blackout to the jury, Dixon would be of no help "in explaining to the jurors what the significance [of this evidence] might be".

### (b) *Judge Jahnke properly concluded that Dixon's proposed testimony was more prejudicial than probative*

Under Evidence Rule 702(a), when a litigant offers a person as an expert witness in a particular field of knowledge, the litigant must demonstrate that the proposed witness is qualified to give an opinion in this field by virtue of their "knowledge, skill, experience, training, or education". However, the Alaska Supreme Court has clarified that "[t]he true criterion [for determining whether a person qualifies as an expert witness] is whether the jury can receive appreciable help from this particular person on this particular subject." [20]

The trial judge must determine whether the proposed witness meets this test, and the trial judge has wide discretion on this question.[21] In this case, Ragsdale contends that Judge Jahnke abused his discretion when he ruled that Dixon would not be allowed to testify about the phenomenon of alcoholic blackout.

Ragsdale argues that Dixon's testimony would have provided the jury appreciable assistance on the issue of alcohol's effects on people. In particular, Ragsdale asserts that Dixon's testimony would have been helpful to the jury regarding the possibility that the victim in this case might have consented to have sex with Ragsdale but was experiencing an alcoholic blackout at the time.

The record does not support Ragsdale's argument. As explained above, Dixon did not claim to have expertise in diagnosing alcoholic blackout—in determining whether a person might have been experiencing an alcoholic blackout based on their alcohol consumption or their behavior. Indeed, Dixon told the court that there was no consensus

among professionals as to what caused—or indeed, what constituted—an alcoholic blackout. That is, there was no scientific agreement concerning the origin or nature of this phenomenon.

Just as important, Ragsdale's attorney ultimately told Judge Jahnke that he did *not intend* to have Dixon testify about "whether or not [the victim in this case] was in an alcoholic blackout on the day in question, or anything about this particular case". Rather, the defense attorney said, Dixon was being offered as a witness simply to establish "what an alcoholic blackout is". Given the fact that Dixon did not claim to have any expertise regarding the causes or the defining characteristics of alcoholic blackout, Judge Jahnke could reasonably interpret the defense attorney's offer of proof as a request to have Dixon take the stand and simply repeat the definitions of "alcoholic blackout" that he had gleaned from various texts and web sites.

From Judge Jahnke's comments, he obviously doubted whether Evidence Rule 702(a) contemplated this type of "instant expert". Dixon's *voir dire* testimony showed that he was a person who had sufficient general knowledge of alcohol abuse and the treatment of alcoholism to be able to research the particular topic of alcoholic blackouts in anticipation of Ragsdale's trial. But, based on Dixon's answers during *voir dire*, it is hard to tell how Dixon's knowledge of alcoholic blackouts exceeded the knowledge that might be gleaned on a few days' notice by any attorney or other educated lay person who was similarly motivated to research the topic.

Even assuming that Dixon, by virtue of his prior training as an alcoholism counselor, should have been considered an expert on the narrow question of "what an alcoholic blackout is"—*i.e.*, the various (and differing) ways in which the term "alcoholic blackout" is defined within the profession—we nevertheless uphold Judge Jahnke's decision not to allow Dixon to testify on this subject.

**20.** *Osborne v. Hurst,* 947 P.2d 1356, 1362 (Alaska 1997) (quoting *Crawford v. Rogers,* 406 P.2d 189, 192 (Alaska 1965)).

**21.** *See Norris v. Gatts,* 738 P.2d 344, 350 (Alaska 1987); *Ferrell v. Baxter,* 484 P.2d 250, 267 (Alaska 1971); *New v. State,* 714 P.2d 378, 380 (Alaska App.1986).

As explained above, the Alaska Supreme Court has adopted a fairly broad definition of expert witness: the test is whether the jury can receive appreciable help from this particular person on this particular subject. Nevertheless, the supreme court continues to affirm the rule that a trial judge has broad discretion in deciding whether to allow an expert witness to testify. As the supreme court recently explained in *Barrett v. Era Aviation, Inc.,*

> As a general rule, the trial judge retains "wide latitude" in deciding whether to admit the testimony of an expert witness. In *Lewis v. State* [, 469 P.2d 689, 695–96 (Alaska 1970) ], we held that the test for reversible abuse of discretion was "whether the reasons for the exercise of discretion are clearly untenable or unreasonable," noting that [the] reasonableness [of the judge's decision] depended on whether the trial judge balanced "the value of the evidence against the danger of undue prejudice, distraction of the jury from the issues, and waste of time."

996 P.2d 101, 103–04 (Alaska 2000) (footnotes omitted).

In Ragsdale's case, Judge Jahnke clearly applied this balancing test when he ruled that Dixon would not be allowed to testify. As explained above, Judge Jahnke repeatedly expressed the concern that Dixon's testimony would only lead the jury into baseless speculation as to whether the victim in this case might have experienced an alcoholic blackout. The judge pointed out that Dixon did not claim to have expertise "in diagnosing [alcoholic] blackout [or in] differentiating [alcoholic] blackout from other phenomena". Thus, Judge Jahnke concluded, if Dixon was allowed to take the stand and explain the definition of alcoholic blackout, he would not be able to "explain[ ] to the jurors what the significance [of this evidence] might be".

As we noted above, Ragsdale's attorney disclaimed any intention of having Dixon testify about "whether or not [the victim] was in an alcoholic blackout on the day in question, or anything about this particular case". This being so, the only foreseeable result of Dixon's proposed testimony would be to lead the jury into groundless speculation. Both Evidence Rule 403 and the supreme court's decision in *Barrett* call upon trial judges to prevent this from happening, and Judge Jahnke was quite properly trying to forestall this result in Ragsdale's case.

We therefore conclude that even if Dixon conceivably qualified as an expert on the various definitions of "alcoholic blackout", Judge Jahnke nevertheless did not abuse his discretion under Evidence Rule 403 when he refused to let Dixon testify about these definitions.

Ragsdale asserts that Judge Jahnke's ruling deprived him of his constitutional right to present a defense. But we have repeatedly held that a trial judge's proper application of Evidence Rule 403 does not violate a defendant's right to present a defense or to confront the witnesses against them.[22] We reach the same conclusion here.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

22. *See Zeciri v. State,* 779 P.2d 795, 797 (Alaska App.1989); *Larson v. State,* 656 P.2d 571, 575

(Alaska App.1982).